## CURETON LUMBER CO. v. HAMMOND LUMBER CO. *

Circuit Court of Appeals, Fifth Circuit.
January 4, 1929.

No. 5349.

J. Walter Kehoe and Stuart Mackenzie, both of Miami, Fla. (Harold Kassewitz and Price, Price, Kehoe & Kassewitz, all of

*Rehearing denied February 19, 1929.

Miami, Fla., on the brief), for appellant and cross-appellee.

L. S. Julian, of Miami, Fla. (Shutts & Bowen, of Miami, Fla., on the brief), for appellee and cross-appellant.

Before WALKER and FOSTER, Circuit Judges, and BORAH, District Judge.

FOSTER, Circuit Judge. The Hammond Lumber Company filed a libel in rem against 1,650,000 feet of lumber, the cargo of the steamship Samoa, to recover demurrage, estimated at $10,800, for the detention of that vessel, owned by it. The Cureton Lumber Company claimed the lumber as owners. The parties will hereafter be referred to, respectively, as libelant and claimant. Judgment was rendered in favor of libelant in the sum of $7,550 without interest. From this judgment claimant has appealed. By cross-appeal libelant seeks to have interest added to the judgment. Libelant chartered the steamship Samoa to the Henry D. Davis Lumber Company to convey a cargo of lumber from Puget Sound to Miami, Fla., the cargo consigned to claimant. The charter contained the following provisions: Cargo to be discharged at the rate of not less than 300,000 feet per day, Sundays and holidays excepted, unless used, at such safe dock or place as charterers or their agents shall designate; time for discharging to start 24 hours after vessel's arrival at port of discharge, or as near thereto as she may safely get, notice having been given by master in writing. Demurrage at the rate of $300 per day, ship in berth or not. Pilotage to be paid by steamer. Vessel to load and discharge where she can at all times safely lie afloat; lighterage to be at risk and expense of cargo. The casualty clause included, inter alia, the following: "Accidents on railways and/or docks and/or wharves, or any other hindrances beyond the control of either party to this agreement or their agents, always mutually excepted."

The record supports the following conclusions as to the material facts:

The Samoa arrived at Miami, Friday, January 8, 1926, and anchored at the usual place, about six miles from shore, about 7 a. m. Some time that afternoon the captain sent ashore a written notice of arrival to be mailed to claimant. This notice was not received until the afternoon of Sunday, January 10th. On the morning of Saturday, January 9th, Albury & Co., the ship's agent, served notice of arrival on claimant, which claimant declined to receive as not conforming to the charter. On that afternoon the captain confirmed this notice in writing.

Claimant had secured a berth for the ship at pier No. 3. There was a dredge working in pier No. 3, but the port authorities intended to have it moved out to let the ship in. The pier was safe and suitable, and the ship was subsequently discharged there. The port of Miami was very much congested, and vessels were not allowed to enter and dock without a permit. Claimant procured the necessary permit, which was delivered to the Bar Pilots as was usual. Lecain, a pilot, went out to the Samoa on the afternoon of January 9th for the purpose of bringing her in. The channel was narrow, ships could not pass each other in it, and he was delayed in bringing in the Samoa by other ships going out until after high tide. The Samoa was drawing about 17 feet 3 inches and the channel had about 18 feet depth. Except on express orders from the owners, ships drawing over 17 feet were not brought in except at high tide. The pilot did not think there was enough water to bring the Samoa in, and left, intending to return the next day. The next high tide was the following afternoon. On the morning of Sunday, January 10th, the ship Valdimar turned over in the channel, completely blocking it. Due to this the Samoa was not berthed until Sunday, February 7th. Thereafter the discharging proceeded well within the rate fixed by the charter.

Claimant relies principally on the exception of the charter above quoted. Libelant contends that the cargo could have been unloaded on lighters where the ship was at anchor, or a berth could have been secured at Fisher's Basin or the Meteor Docks, nearby locations, to reach which it was not necessary to use the channel. Charters are generally couched in technical language, but are to be construed reasonably so as to give effect to the intent of the parties. It is needless to cite authorities to this effect. The one in suit is less ambiguous than usual. Under its terms the obligation was on the ship to not only proceed to Miami, but also to discharge her cargo at the wharf designated by claimant after notice of arrival, provided it was safe and suitable. This included a safe channel to reach the dock. Considering the congested condition of the harbor and the necessity of securing a permit to enter, the ship had arrived for the purpose of giving notice, when she reached the anchorage. Had claimant been in default, the lay days would have begun to run within the terms of the charter 24 hours after.

It is immaterial whether the notice be considered as given in the morning or afternoon of Saturday, January 9th? Sunday did

not count in the lay days. Claimant had until some time on Monday to procure a suitable berth. This obligation was discharged by engaging and designating pier No. 3 and securing the permit to enter the harbor on Saturday. It was then the duty of the ship to proceed to the dock.

It was not the duty of claimant to procure a pilot for the vessel, and, though it did so, when the captain accepted him he became the servant of the ship and claimant was not responsible for any incompetence or error of judgment on his part, though we do not think either is shown. There was ample time to bring the ship in on the high tide on Sunday without incurring delay within the provisions of the charter.

The blocking of the channel was a hindrance beyond the control of either party, clearly within the terms of the charter, and mutually excepted. Having discharged its obligations under the charter, it was not incumbent on claimant to procure another berth for discharging. If that duty was on either party after the blocking of the channel, it was on libelant. If the cargo could have been discharged on lighters where the ship was at anchor and then delivered at pier No. 3, the ship was at liberty to do so, and should have done so for the purpose of minimizing damages. Default in this respect could not be charged to claimant. Without attempting to review the evidence, we think it is shown with reasonable certainty that it would have been impracticable to lighter the cargo or unload it at either Fisher's Basin or any other dock in the vicinity. Consequently, there was no default of either party. Demurrage was not incurred.

Reversed, with instructions to dismiss the libel.