## THOMAS BELL & CO., Limited, et al. v. STEWART et al.

Circuit Court of Appeals, Fifth Circuit.
March 4, 1929.

No. 5501.

of the property, and its surety. The libelants' claim was for demurrage for the detention of the steamship Hitherwood for 49 days at $225 a day. The decree was for libelant for the full amount.

On November 13, 1925, appellees, owners of the Hitherwood and the appellant-claimant entered into a charter party for the freighting of a cargo of lath from a point in New Brunswick, Canada, to Miami, Fla. The Hitherwood was loaded with lath consigned to the Miami Real Estate & Building Company, or its assigns. The Hitherwood arrived at Miami Roads, which was six miles from the port of Miami, December 27, 1925, at noon. Notice of readiness was served by the master on the consignee January 4, 1926, stating that the ship had passed the customs. It was not shown that notice of arrival was served on J. B. Angevine as required by the bill of lading. On the 10th day of January, 1926, and before the expiration of the lay days allowed by the charter party, the channel leading to the harbor of Miami was blocked by the sinking of the steamship Valdemar so that it was impossible for the ship to enter the harbor, and continued blocked until noon February 4, 1926. The lay days were 7, and would have expired noon January 11, 1926. The master of the Hitherwood was first notified by the consignee on February 6, 1926, that a berth for the discharge of the Hitherwood's cargo had been secured, available immediately after the discharge of the steamship Lake Brenton, at pier No. 1, city docks. The Lake Brenton did not finish discharging until February 18, and the berth was not available for the Hitherwood until then. The Hitherwood discharged her cargo on March 1, 1926.

The questions involved are (1) Whether or not the master gave sufficient notice of the arrival of the ship to start the lay days running; (2) whether or not the appellant-claimant was in default in failing to designate a berth for the Hitherwood to discharge her cargo, and in failing to secure a permit from the harbor master for it to discharge; and (3) whether, under the terms of the charter party, the sinking of the Valdemar was an excepted casualty in favor of the claimant.

1. The charter party provided that lay days for loading and discharging shall commence "from the time the captain reports his vessel ready to receive or discharge cargo, having fulfilled Custom House formalities, whether berth or cargo available or not."

H. Reid De Jarnette, of Eatonton, Ga., and Francis M. Miller and John G. McKay, both of Miami, Fla., for appellants.

S. J. Barco, of Miami, Fla. (Stuart Mackenzie, of Miami, Fla., on the brief), for appellees.

Before WALKER and FOSTER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge. This is an appeal from a final decree of the District Court of the United States for the Southern District of Florida in admiralty. The libel was in rem against 6,576,000 pieces of spruce lath and against appellants, claimant

The bill of lading provided: "On arrival at Miami, Steamer to report to Consignees and to J. B. Angevine at 614 N. W. First Street." The charter party provided: "Bills of lading to be signed without prejudice to this charter." Notice of arrival was given consignee January 4th by the master. None was given Angevine. When the vessel arrived in Miami Roads, the place designated by the government for anchorage at the port of Miami, she had then arrived at Miami for the purpose of giving notice of readiness to discharge. Cureton Lumber Co. v. Hammond Lumber Co., 29 F.(2d) 973 (decided by this court January 4, 1929). The notice was therefore not premature.

■■ The terms of the charter party determine the proper person to receive notice of arrival and readiness to discharge as between the owner and the charterer, and, as between them, the charter party controls the bills of lading both by the terms of the charter party and by the settled law, when there is a conflict between them. In this case, the bills of lading prescribe notice both to the consignee and to Angevine; the charter party is silent as to Angevine. So far as concerns the giving of the notice of arrival and readiness to discharge after having passed the customs, the charter party controlled, and notice to the consignee alone sufficed. The additional requirement of the bills of lading that the steamer, on arrival at Miami, was to report to consignee and to Angevine, was applicable only after the vessel had reached *Miami* harbor, and, docked there, was for the purpose of facilitating the handling of the cargo for the protection of the charterers, who were consignors and owners of the cargo, as between them and their agents, the consignees. It did not conflict with the duty placed by the charter party on the master in favor of the charterers to give notice of the ship's arrival and readiness to discharge and thereby fix the time of the running of the lay days. The latter could be given upon the ship's arrival in Miami Roads and its release from the customs and consequent readiness to discharge. The terms of the charter party, not those of the bills of lading, governed the latter, and they did not require notice to be given Angevine. Whether the terms of the bills of lading had a scope apart from the notice of arrival required by the terms of the charter party, or covered the same ground, and were in conflict, in either event, the charter party controlled the giving of notice as between the ship and the charterers. The notice of January 4th to the Miami Real Estate &

Building Company, the consignee, was not premature, and was served on the proper and only person required by the terms of the charter party to be served, and it started the running of the lay days from time of service.

■ 2. The charter party provided "for each and every day's detention by fault of said party of the second part or agent Two Hundred and Twenty-five Dollars, U. S. Currency, or its equivalent, per day, day by day, shall be paid by said party of the second part, or agent, to said party of the first part, or agent," and again, "Vessel to load and discharge at such dock as charterers may designate." It was the duty of the charterer, or its agent the consignee, upon notice of arrival and readiness to discharge from the master, to designate the place of discharge by the terms of the charter party itself. A failure to do so constituted a default in the performance of a duty imposed by contract, and justified the imposition of demurrage under the quoted terms of the charter party. In addition to the duty of designating the place of discharge, by custom of the port of Miami, as shown by the evidence, it was the duty of the consignee of the cargo to secure a permit from the harbor master for the ship to proceed from her place of anchorage to the dock. The consignee first notified the master that he had secured a berth on February 6. The right to discharge at the berth secured was to become effective only after another ship, the Lake Brenton, had finished discharging. The berth was not actually available until February 18, 1926. Through the default of the consignee, as agent for the charterer, in not designating and making available a place of discharge for the ship, a delay in discharging the cargo of 49 days occurred, and, under the terms of the charter party, authorized the assessment of demurrage for that period, unless part of the delay was due to an exception contained in the casualty clause of the charter party.

■ 3. The casualty clause of the charter party excepted "stranding and other accidents of navigation," and this is the only applicable exception. The sinking of the Valdemar was not a case of vis major, and must be held to be an "accident of navigation" within the meaning of the casualty clause to avail. In the Cureton Lumber Co. Case, the language of the casualty clause was different. It excepted hindrances beyond the control of either party. Under the facts of this case, we do not think the delay in discharging any part of it is shown to have

been caused by the blocking of the harbor by the sinking of the Valdemar, but by the default of the consignee in failing to arrange for entrance for the Hitherwood into the harbor by securing a permit from the harbor master, and by designating and securing a berth for her to discharge. If the consignee had acted in these matters with reasonable dispatch, the Hitherwood would have entered the harbor before January 10, the date of the sinking of the Valdemar, and her entrance would not have been blocked thereby. The harbor was cleared February 4. It was not until February 6 that the consignee notified the master of the place of discharge, and it was not until February 18, that the place designated became available to the Hitherwood. The delay would have occurred just the same had the Valdemar not sunk in the channel. Even after the clearance of the harbor, it was 14 days before the consignee provided a berth at which the Hitherwood could discharge.

Concluding that the master properly notified the consignee of the Hitherwood's arrival and readiness to discharge, that the delay in discharging after the lay days commenced running was due altogether to the default of the consignee as agent of the charterer, in failing to designate and provide a berth at which the Hitherwood could discharge, and that the sinking of the Valdemar in the channel of the harbor had no effect in causing or increasing the 49 days' delay, assessment of demurrage for that period by the court below was correct. After the expiration of the lay days, Sundays and holidays are included in the assessment. The charter party excludes them only during the lay days, and, in the absence of an exclusion in the charter party, they are to be included in the computation. Lindsay, Gracie & Co. v. Cusimano (C. C.) 12 F. 504; The Oluf (C. C.) 19 F. 459.

The form of the final decree is criticized, because of the recital of the effect of the commissioner's report, and the provision ordering it to be filed and ratifying and confirming it. The commissioner, under the reference to him, was to make no findings of law or fact, and made none; merely reporting the evidence taken by him. The decree, however, indicates that the District Judge considered the evidence reported by the commissioner, and arrived at his conclusions, and entered the decree, upon his own determination of the issues from such evidence.

Finding no error in the record, the decree of the District Court is affirmed.