## THE GLENFINLAS.

## DAVIS v. CARGO OF CHALK et al.

(Circuit Court of Appeals, Second Circuit.  December Term, 1891.)

1. DEMURRAGE—CHARTER—RATE OF DISCHARGE OF CARGO—CUSTOM OF PORT.
   The charter of a ship for a cargo of 3,000 tons of chalk provided that cargo should be discharged "as fast as she can deliver." She was capable of discharging more than 150 tons per day. While the cargo was being discharged, the consignee notified the ship "that the customary delivery of chalk at this port is not over 150 tons per day," that he could not take care of more, and that he would hold the ship responsible for any over that amount put on the dock. *Held*, that the ship, under her charter, was entitled to deliver as fast as she could, without reference to the custom of the port, and that the consignee, having provided inadequate facilities for such rapid discharge, was liable for demurrage on account of the ship's delay thereby caused.

2. SAME—DISCHARGE FROM SINGLE HATCH.
   The ship had two hatches, from which cargo could have been discharged into two lighters of proper size on one side, but the consignee did not provide lighters capable of taking cargo from both hatches at the same time. *Held*, that the ship did not lose her right to demurrage by not breasting out, so as to admit of discharge from both sides of the vessel.

   42 Fed. Rep. 232, modified.

Appeal from the Circuit Court of the United States for the Southern District of New York.

In Admiralty.  Libel by Ebenezer H. Davis against a cargo of chalk, lately on board of the ship Glenfinlas, and Howard Fleming, consignee, for demurrage.  Decree for libelant.  Respondents appeal.  Modified.

STATEMENT BY THE COURT.

The ship Glenfinlas arrived at the port of New York on July 5, 1889, with a cargo of 3,000 tons of chalk consigned to Howard Fleming. She is a large vessel, 2,148 tons register, 280 feet long, and with four hatches. The cargo was brought under a charter which provided that she was "to discharge at two safe wharves, as ordered; any expense incurred * * * in shifting from first to second wharf to be paid by charterers, or so near thereunto as she may safely get, and there, always afloat, deliver the same." It also contained this provision: "Cargo to be supplied as fast as vessel can load, and to be discharged as fast as she can deliver. * * * If required, ten days on demurrage, over and above the said laying days, at four pence per registered ton per day." This would be $175 per day. The Glenfinlas promptly notified her arrival to the consignee of the chalk, and asked for a berth, repeating the request on July 6th (Saturday) and July 8th. On the latter day the consignee asked the ship to select a dock where lighters could go along-side and receive cargo, promising to place lighters along-side as soon as she gave notice that she was berthed. The ship secured a berth at Atlantic dock that same day, gave notice, was in her berth ready to discharge at 6 A. M. Tuesday, July 9th, and rigged two hatches with tackle. No lighter came till 5:30 P. M. of the 10th, too late to commence discharging. Work commenced on Thursday, the 11th, and continued the rest

of that week, into two canal-boats, the Mary Ann and Home Rule, which were too long to admit of both being worked at the same time on one side, and not strong enough to take cargo from more than one hatch. During these three days 600 tons were discharged from the one hatch. On the 11th the consignee notified the ship that "the customary delivery of chalk at this port is not over 150 tons per day," that he would not take care of more, and would hold the ship responsible for any more put on the dock. The ship replied, at once, insisting that, under her charter, the chalk was to be received as fast as she could deliver. Work was resumed on Monday, July 15th, and continued until 9:30 A. M. of Friday, the 19th. Two lighters received cargo, the Hope and the Baltic. They were of appropriate size and sufficient strength to have worked at the same time on one side of the vessel, thus admitting of discharge from two hatches, had they come together; but the Baltic did not appear till 1:30 P. M. of the day on which the Hope finished, the latter being fully loaded by 9:30 A. M. These two lighters took 800 tons. On Friday, the 19th, the vessel was ordered to Taintor's dock, on Newtown creek, too late to avail of the tide that day. She moved to her second wharf on Saturday, the 20th, and work began there on the afternoon of the 22d, 60 tons being discharged that day. Taintor's dock is one of the principal docks in the city for the delivery of chalk. It is fitted with a railway, so arranged that discharge is possible from only one hatch at a time. On the next four days, including Friday, July 26th, 344 tons were discharged. Up to this time the weather had been uniformly fine, there being no rain to interfere with the discharge. Afterwards there were occasions when the work was prevented by rain, there were slight delays from accidents to the cars on the railway, and more than half a day was lost in consequence of insufficient water in the creek, which prevented shifting the Glenfinlas, so as to bring another hatch into position. The discharge was completed on Friday, August 2d. On July 19th the ship protested against the slow rate of discharge, and on the 22d wrote twice, complaining of the unsuitable character of Taintor's dock, as not permitting rapid discharge. The decree below allowed demurrage for seven days.

*Robert D. Benedict*, for appellant.

*Wilhelmus Mynderse*, for appellee.

Before WALLACE and LACOMBE, Circuit Judges.

LACOMBE, Circuit Judge. We are of the opinion that the learned district judge was entirely correct in holding that the charter provided for the rate of delivery, at such places and during such days and times as the ship might be properly worked, under the usage of the port; and that the evidence introduced by the claimants—that according to the usual practice of the port, as respects the delivery of ordinary cargoes of chalk, a hundred and fifty tons per day is as much as is expected to be received or delivered—does not control the plain intent of the charter to provide for a rapid discharge during working hours; especially as the vessel was a much larger one, and the cargo much larger, than were

usual in the ordinary transportation of chalk cargoes. In the discharge of ordinary cargoes, vessels of her size use at least two hatches, and under the charter the Glenfinlas was entitled to do so despite the evidence of a contrary practice having reference to smaller vessels and smaller cargoes.

We do not think, however, that the Glenfinlas lost that right, at her first wharf, by not breasting out, in view of the evidence that she was attended by lighters which could easily have taken cargo from two hatches at the same time had they come together. The rate of discharge from one hatch during the fair weather, both at the first wharf and at Taintor's dock, was 200 tons or a little over per day. It must be inferred that she could have discharged at least 400 tons from two hatches, which would give eight lay-days, and a day may be allowed for removal to the second wharf. The lay-days began Tuesday, July 9th, and expired (including the day for removal) on Thursday, July 18th. She was detained 15 days more, for which she should be allowed the demurrage at the rate fixed by the charter. The cause is remanded for further proceedings, in accordance with views herein expressed. Costs of the district court and of this court to the libelant.