## STEAMSHIP CO. OF 1912 v. C. H. PEARSON & SON HARDWOOD CO., Inc.

Circuit Court of Appeals, Second Circuit.
February 18, 1929.

No. 166.

772

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (Earl Appleman and L. De Grove Potter, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Fearey, Clark & Hupper, of New York City (William J. Dean, of New York City, of counsel), for appellee.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge (after stating the facts as above). ■■■ The most important question raised by this appeal is whether, under a charter providing that "charterers are to furnish cargo alongside steamer within reach of steamer's tackles as fast as steamer can load in suitable hours and weather," evidence was admissible that it was customary at the loading ports to load cargo into one or two hatches at a time, although the ship was prepared to receive at four hatches. All stevedoring was, under the charter, to be for account of the ship.

Evidence was adduced by the respondent that at times there was failure to load into more than one hatch when cargo was alongside for two, but that matter can be dealt with before the commissioner. It was also said that there were not stevedores enough furnished by the libelants to load at more than two hatches, but they were apparently available, and were not employed simply because cargo was not alongside in sufficient quantities to justify their presence. The contention amounts to no more than saying that the ship should have had stevedores in excess of the number she could use for the cargo supplied. If a sufficient number to meet the actual supply of cargo were not on hand, this can be dealt with before the commissioner.

There was also testimony that at two of the four ports, namely, Lacarto and Tamarindo, the vessel anchored too far out, in a place that was not customary, and in this way caused some unnecessary delay in loading, which should abate any demurrage pro tanto. Undoubtedly the vessel was obliged to go within customary distance of the port, and this again can be shown in connection with the computation of demurrage. Unless the evidence that loading into one or two hatches was customary, and the custom of the port can be read into the charter, so as to justify the respondent in not furnishing cargo as fast as the steamer could load in suitable hours and weather, the charter must be taken as it reads, and demurrage must be allowed at the full capacity of the ship, with such abatement as may be proved because of any delay on her part, caused by anchoring too far out at the ports of Lacarto and Tamarindo, and because of failure to supply sufficient stevedores for cargo actually on hand.

The trial judge said (oral opinion, unreported) : "If the charter party provides definitely for the number of lay days for loading and unloading the charterer is bound by that provision. If the number of days be not specified, then the ship must be loaded within a reasonable time. And * * * what is 'a reasonable time' is dependent upon circumstances and the custom and usage of the port."

To support the foregoing statement of law the respondent relies largely on the English cases, and particularly on Hulthen v. Stewart & Co., [1903] A. C. 389. There the clause in the charter read:

"The cargo to be loaded and discharged with customary steamship dispatch as fast as the steamer can receive and deliver during the ordinary working hours of the respective ports, but according to the custom of the respective ports. * * *"

Owing to the crowded state of the docks, the ship in that case did not get to her berth for 10 days after arrival. The trial court and Court of Appeals both held that the consignees had done all they reasonably could to discharge the vessel and dismissed the claim for demurrage. This disposition was affirmed by the House of Lords. It is to be observed that the clause in the charter there contained the words "according to the custom of the respective ports." Nevertheless the clause was treated very broadly, and Lord MacNaghten said:

"It is, I think, established that, in order to make a charterer unconditionally liable, it is not enough to stipulate that the cargo is to be discharged 'with all dispatch' or as 'fast as steamer can deliver' or to use expressions of that sort. In order to impose such a liability, the language used must in plain and unambiguous terms define and specify

the period of time within which the delivery of the cargo is to be accomplished."

The English Court of Appeal in Temple v. Runnals, [1902] 18 Times L. R. 822, dealt with a clause in a charter party that contained nothing about the custom of the port, and merely said: "The cargo to be loaded and discharged as fast as steamer can receive and deliver during usual working hours." The court there held that a stipulation for a fixed number of days should not be imported by implication into the charter party, and that a contract worded as in that case "only imported an obligation on the charterer to use all reasonable skill and diligence." The court relied on the decision in Hulthen v. Stewart, which had not then reached the House of Lords, and also on Lyle Shipping Co. v. Cardiff Corp., [1900] 2 Q. B. 638. The charter in that case, however, provided that the vessel be "discharged with all reasonable dispatch as customary."

Respondent's contention as to the effect of the English cases seems to be fortified by the remarks of Carver (7th Ed.) § 614, and also by Scrutton (11th Ed.) p. 352. But in spite of the presumptive correctness of the reasoning of such eminent authorities, it is still to be borne in mind that, in the case of Hulthen v. Stewart, supra, the charter party contained the words: "according to the custom of the respective ports."

We are referred to no English case, except Temple v. Runnals, supra, which preceded the final decision in Hulthen v. Stewart, where a clause providing for loading "as fast as steamer can load" has been taken to mean no more than that the charterer shall act reasonably under the circumstances in view of the customs of the port.

But, whatever may be said of the English cases, this court, in Hine v. Perkins, 55 F. 996, and The Glenfinlas, 48 F. 758, is committed to the doctrine that the rate at which the ship can take is the measure of proper dispatch in such a clause as the one here.

In still another case, Tweedie Trading Co. v. Strong, 195 F. 929, we again held that a clause requiring "the goods are to be received by the consignee immediately the vessel is ready to discharge, and continuously at all such hours as the custom house or port authorities may give permission for the ship to work, or if necessary to discharge into lighters at the risk and expense of the consignees," required the consignees to take cargo continuously, and we held that they were not relieved of this obligation, even though

they were prevented from getting lighters by acts of the Japanese government. See, also, the decision of Adams, J., in McCaldin v. Cargo of Scrap Iron (D. C.) 111 F. 411. Our decision in Steamship Rutherglen Co. v. Howard Houlder & Partners, 203 F. 848, where the language used was "with all possible speed, according to the custom of the port of discharge," is not contra. Such a clause inevitably incorporated the "custom of the port," and called only for reasonable speed under all the circumstances.

Such cases as Hick v. Raymond, [1893] A. C. 32, and Empire Transp. Co. v. Philadelphia, etc., Co. (C. C. A.) 77 F. 919, 35 L. R. A. 623, where there appear to have been no clauses like "as fast as steamer can load," can have no bearing upon the present situation.

After all, the primary question is: What did the parties contract to do? It is certainly easy enough for them to insert the words "custom of the port" into the charter party, if they intend to have demurrage measured by all the surrounding circumstances, rather than by the capacity of the ship to load. We see no warrant in translating the words "as fast as steamer can load" into an indefinite obligation to act in a reasonable manner. In any event, we have repeatedly held the contrary, and adhere to our former decisions.

 In respect to the minor question of the claim for dead freight upon the logs, we concur with the court below. There was testimony that a variation to the extent of 10 per cent. was a customary construction of the ambiguous word "about." We differ, however, with the trial court in allowing dead freight on fustic at the gross rate of $9.50 per ton mentioned in the charter. That award should have been based upon a net rate, instead of a gross rate, because the appellant, in order to earn its gross freight, would have had to pay for loading and discharging, and, as is contended, other expenses. The correct measure of damages for dead freight on the fustic is the gross freight on the cargo not shipped, "less any expenses saved by the steamer because of not carrying it." New York & Cuba Mail S. S. Co. v. Guayaquil & Q. R. Co. (C. C. A.) 270 F. 200.

The interlocutory decree is modified, so that it shall provide for an award of dead freight on the fustic, based only upon the gross freight on that cargo less any expenses saved by the steamer because of not carrying it, and shall allow demurrage in accordance with the foregoing opinion.