**HELLENIC LINES, LIMITED, Plaintiff,**

v.

**The EMBASSY OF PAKISTAN,**
**Defendant.**

**The EMBASSY OF PAKISTAN,**
**Plaintiff,**

v.

**HELLENIC LINES, LIMITED,**
**Defendant.**

**Nos. 64 AD. 212, 65 AD. 100.**

United States District Court
S. D. New York.

Nov. 14, 1969.

**948**

Cardillo & Corbett, New York City, for plaintiff Hellenic Lines; Joseph Cardillo, Jr., Robert V. Corbett, New York City, of counsel.

Dunn & Zuckerman, New York City, for defendant Embassy of Pakistan;

Morton Zuckerman, New York City, of counsel.

## OPINION

BONSAL, District Judge.

In this action,[1] tried before the court on June 30, and July 1 and 2, 1969, plaintiff Hellenic Lines, Limited, a Greek limited liability company operating vessels in the liner trade between the United States and Pakistan, seeks damages for detention of its vessels. The alleged detention arose in connection with twenty-four shipments of grain by defendant, the Embassy of Pakistan, aboard plaintiff's vessels, beginning in early 1958, from ports in the United States to Karachi in West Pakistan, and Chittagong and Chalna in East Pakistan.[2] The shipments were made pursuant to negotiable bills of lading issued in Louisiana and Texas, and freight contracts or booking notes entered into in New York and Washington, D. C.

A brief summary of each of the voyages follows:

## I. S/S HELLENIC SKY:

The HELLENIC SKY arrived at Karachi on April 18, 1958, at 1930 hours; the next working shift began on April 19 at 0730 hours, but she was not berthed until May 5, 1958, at 1530 hours. Discharge began on May 5, 1958, at 1900 hours, and was completed on May 13, 1958 at 1530 hours.

## II. M/V MAAS:

The MAAS arrived at Chittagong on October 26, 1959 at 1300 hours; the next working shift began at 2000 hours. She was not berthed until October 28 at 1020 hours, and discharge of the bulk wheat cargo began at 1030 hours. Delay

1. This action and its companion, 65 Ad. 100, were consolidated for trial by order of Judge McGohey on May 5, 1966. The Embassy of Pakistan, plaintiff in 65 Ad. 100, has since withdrawn its action.

2. Defendant in its answer raised the defense of laches. The state statute of limitations, which is applicable by analogy

to this action, Redman v. United States, 176 F.2d 713 (2d Cir. 1949) ; West African Steamship Co. v. McAllister Brothers, Inc., 287 F.Supp. 102 (S.D.N.Y. 1968), is six years, N.Y. CPLR § 213(2). This action was commenced within six years; accordingly, plaintiff is not guilty of laches.

in discharge was caused by fixing of a derrick, lack of railway wagons, shunting of railway wagons, some by hand, lack of barges, shifting of barges, absence of tally clerks, tardiness of a member of the food department, and by rain. Discharge was completed on November 8, 1959 at 1030 hours.

### III. M/V HELLENIC HERO:

The HELLENIC HERO arrived at Chittagong on November 19, 1959 at 1020 hours, and was berthed at 1545 hours. The next working shift was at 2000 hours, and discharge began at that time. Delay in discharge was caused by a shortage of railway wagons, shunting of railway wagons, some by hand, an inoperative winch, inoperative shore cranes, wagons out of position, and by the changing of, late arrival of, and absence of tally clerks. Discharge was completed on November 30, 1959, at 1730 hours.

### IV. M/V HELLENIC GLORY:

The HELLENIC GLORY arrived at Chittagong on December 3, 1959, at 0900 hours; the next working shift began at 2000 hours. She was berthed on December 4, 1959, at 1535 hours, and discharge of the bulk wheat cargo began at 2000 hours. Delay in discharge was caused by a shortage of railway wagons, delay in placing bags aboard the vessel, a derrick out of position, hand shunting of railway wagons, interference of the general cargo with the work, lack of barges, late arrival of a barge loader, shortage and replacement of bags, and by rain. Discharge was completed on December 15, 1959 at 1500 hours.

### V. S/S HELLENIC BEACH:

The HELLENIC BEACH arrived at Karachi on March 1, 1960, at 1015 hours; the next working shift began at 1930 hours. She was not berthed until March 3, 1960, at 1615 hours, and discharge of the bulk wheat cargo began at 2100 hours. Delay in discharge was caused by shortage of bags and railway wagons, and by shunting of railway wagons. Discharge was completed on March 8, 1960 at 1500 hours.

### VI. S/S HELLENIC SPLENDOR:

The HELLENIC SPLENDOR arrived at Chittagong on March 17, 1960, at 0940 hours. She was berthed at 1415 hours; the next working shift began at 2000 hours, and discharge began at 2140 hours. Delay in discharge was caused by lack of customs officials or members of the food department, late arrival of tally clerks, lack of railway wagons, a broken partition, the food department's order that discharge be stopped, shifting of barges, hand shunting of railway wagons, lack of barges, and a master's order. Discharge was completed on March 27, 1960 at 1240 hours.

### VII. M/V HELLENIC SPIRIT:

The HELLENIC SPIRIT arrived at Chittagong on May 19, 1960, at 0745 hours; the next working shift began at 2000 hours. She was not berthed until May 24, 1960 at 1230 hours, and discharge began at 1400 hours. Delay in discharge was caused by lack of wagons, hand shunting of wagons, an inoperative crane, an inoperative winch, and by rain. Discharge was completed on May 31, 1960 at 1130 hours.

### VIII. S/S HELLENIC DESTINY:

The HELLENIC DESTINY arrived at Chittagong on September 23, 1960, at 0830 hours; she was not berthed until September 26, 1960, at 1700 hours. Discharge began on September 27, 1960, at 2000 hours. Delay in discharge was caused by break periods, out of position lighters and railway wagons, inoperative cranes, shunting of railway wagons, lack of railway wagons, and by rain. Discharge was completed on October 9, 1960, at 0230 hours. The cargo discharged was both bagged flour, which was to be discharged by the vessel, and bulk wheat.

### IX. S/S HELLENIC SPLENDOR:

The HELLENIC SPLENDOR reached Chalna on March 24, 1961, at 1815 hours; the next working shift began at 0800 hours. Discharge began on March 26, 1961, at 0700 hours. Delay in discharge was caused by fixing of derricks,

lack of lighters, late arrival of the labor launch, replacement of barges, lack of barges, lateness of barges, shifting of barges, a barge's refusal to take a tally clerk aboard, late arrival of labor, rough weather, and rain. Discharge was completed on April 7, 1961, at 2200 hours.

## X. S/S HELLENIC DESTINY:

The HELLENIC DESTINY arrived at Chittagong on March 16, 1961, at 2000 hours; the next working shift began on March 17, 1961, at 0800 hours. She was berthed at 1400 hours, and discharge began on March 19 at 2000 hours. Delay in discharge was caused by lack of lighters, shifting of the vessel, lack of railway wagons, break periods, a holiday, failure to obtain boat licenses, and by rain. Discharge was completed on March 30, 1961, at 0300 hours.

## XI. M/V HELLENIC TORCH:

The HELLENIC TORCH arrived at Chittagong on July 14, 1961, at 0730 hours; the next working shift began at 2000 hours. She was berthed on July 15, 1961, at 1400 hours, and discharge began on July 16, 1961 at 0730 hours. Delay in discharge was caused by lack of railway wagons, shunting of railway wagons, the absence and tardiness of port staff and tally clerks, fixing of a derrick, shifting of the vessel, and by rain. Discharge was completed on August 5, 1961, at 1730 hours.

## XII. M/V HELLENIC SAILOR:

The HELLENIC SAILOR arrived at Chittagong on September 28, 1961, at 1355 hours; the next working shift began at 2000 hours. She was not berthed until October 5, 1961, at 1130 hours, and discharge then began at 1330 hours. Delay in discharge was caused by lack of railway wagons, absence of a tally clerk, partitioning in the hatch, shunting of railway wagons, and the late arrival of a barge. Discharge was completed on October 10, 1961, at 1000 hours.

## XIII. M/V HELLENIC HERO:

The HELLENIC HERO arrived at Chittagong on October 15, 1961, at 1045

hours; the next working shift began at 2000 hours. Discharge began at the anchorage on October 17, 1961, at 1500 hours, and was completed on October 18 at 0450 hours. She was then berthed at 0940 hours. Delay in discharge was caused by lack of railway wagons, and by rain. Discharge was completed on October 30, 1961, at 1100 hours.

## XIV. S/S HONG KONG EXPORTER:

The HONG KONG EXPORTER arrived at Karachi on November 16, 1961, at 1330 hours, and was berthed at 1540 hours. The next working shift began at 1900 hours, and discharge of the bulk cargo began on November 17, 1961, at 0945 hours. Delay in discharge was caused by detention of cranes due to opening of hatches and beams, by shortage of railway wagons, and by shifting of cranes. Discharge was completed on November 23, 1961 at 1000 hours.

## XV. M/V HERLAND:

The HERLAND arrived at Chittagong on December 3, 1961, at 0700 hours; the next working shift began at 0800 hours. She was berthed on December 4, at 1030 hours, and discharge began at 1330 hours. Delay in discharge was caused by fixing of derricks, loading of shifting boards, shunting of railway wagons, lack of railway wagons, and changing of crane wire. Discharge was completed on December 10, 1961, at 0430 hours.

## XVI. S/S HELLENIC DESTINY:

The HELLENIC DESTINY reached Chalna on February 18, 1962, at 0510 hours; the next working shift began the same day at 2000 hours. Discharge began at 2240 hours. Delay in discharge was caused by lack of barges, the opening of hatches, the late arrival of transport, the placement of barges, the placement of bags, and by rain. Discharge was completed on February 24, 1962, at 0530 hours.

## XVII. M/V HELLENIC LAUREL:

The HELLENIC LAUREL arrived at Karachi on February 17, 1962 at 1100

hours, and was berthed on February 18 at 1145 hours. The next working shift after arrival was at 1900 hours on the 17th. Discharge commenced on February 19 at 0920 hours. Delay in discharge was caused by lateness of labor and bags, and by inoperative shore cranes. Discharge was completed on February 23 at 2230 hours.

## XVIII. M/V HELLENIC GLORY:

The HELLENIC GLORY reached Chalna on November 12, 1961, at 1425 hours; the next working shift began at 1500 hours, and discharge began at that time. Delay in discharge was caused by late arrival of labor, shifting of the vessel, lack of barges, the replacement of barges, and by an inoperative winch. Discharge was completed on November 26, 1961 at 0400 hours.

## XIX. M/V HELLENIC SPIRIT:

The HELLENIC SPIRIT arrived at Chalna on July 1, 1962, at 1425 hours; the next working shift began at 2000 hours. Discharge began on July 2, at 0100 hours. Delay in discharge was caused by late arrival of the labor launch, the fixing of booms, shifting of cotton bales in the hold, lack of lighterage, the replacement of barges, the opening of the pidder box, the shifting of barges, fixing of derricks, and by rain. Discharge was completed on July 13, 1962, at 0730 hours.

## XX. M/V HELLENIC HERO:

The HELLENIC HERO arrived at Chittagong on October 6, 1962, at 2130 hours; the next working shift began on October 7, 1962, at 0800 hours. She was berthed on October 9, at 0930 hours, and discharge began at 1430 hours. Delay in discharge was caused by lack of railway wagons, an inoperative crane, and by rain. Discharge was completed on October 16, 1962, at 0730 hours.

## XXI. M/V HELLENIC SAILOR:

The HELLENIC SAILOR reached Chalna on December 13, 1962, at 1335 hours; the next working shift began at 2000 hours. Discharge began at 2030 hours. Delay in discharge was caused by lack of lighterage, and the late arrival of labor. Discharge was completed on December 21, 1962, at 2000 hours.

## XXII. M/V HELLENIC LAUREL:

The HELLENIC LAUREL reached Chalna on January 27, 1963, at 1125 hours; the next working shift began at 2000 hours. She was at anchorage on January 28, 1963, at 1435 hours. Discharge began at 1435 hours. Delays in discharge were caused by the late arrival of labor, and the holiday of Ramajam. Discharge was completed on February 9, 1963, at 0430 hours.

## XXIII. M/V HELLENIC SPIRIT:

The HELLENIC SPIRIT reached Chalna on December 29, 1962, at 0830 hours; the next working shift began on December 31, 1962, at 0800 hours. She was at anchorage on December 29, 1962, at 1530 hours. Discharge began on December 31, 1962, at 1545 hours. Delay in discharge was caused by lack of empty barges, and the late arrival of labor. Discharge was completed on January 15, 1963, at 0345 hours.

## XXIV. M/V HELLENIC GLORY:

The HELLENIC GLORY arrived at Karachi on February 9, 1963 at 1020 hours; the next working shift began at 2000 hours. She was berthed at 1245 and discharge began at 2045. Delay in discharge was caused by failure of and late supply of shore cranes, a strike by bagging labor (refusing to work the night shift), and shunting of railway wagons. Discharge was completed on February 17 at 0200 hours.

*The Ports:*

*Karachi*

Karachi is a port with berths for discharging cargo. Although there are limited facilities for discharge in the channel, wheat is discharged only from berths.

The administration of the port of Karachi is controlled by an agency of the

Government of Pakistan called the Karachi Port Trust, which establishes rules and regulations for the management of the port. Berths in the port are assigned to vessels by a Berthing Committee comprised of port officials. Under the Port Trust Rules and the procedures generally followed in the Port, the vessel's agent attends to the necessary formalities for entry of the vessel into the Port.

The Karachi Port Trust Rules in effect at the time the voyages were made provided that:

"The berthing of vessels at the Keamari wharves shall ordinarily take place in the order of their arrival off the port. The deputy conservator shall berth or moor all vessels on arrival. All subsequent moves are to be under the direction of the traffic manager or his deputy."

and Haider, an employee of James Finley & Company, Limited, Hellenic Lines' agent in Karachi, testified that vessels carrying general cargo were always berthed on a "first come first served" basis. He also testified that during this period the usual wait for a berth once a vessel arrived at the road outside the harbor was two to three days.

Haider also testified that the Government of Pakistan, specifically the Ministry of Food, had the authority to assign a berth immediately to a vessel carrying a grain cargo, because of Pakistan's need for food, and that the Berthing Committee would give such vessels priority; he testified that on one occasion the S/S HELLENIC GLORY was berthed immediately on arrival by the Berthing Committee pursuant to a written request of the Ministry of Food.

Cargo to be discharged by the receiver was discharged by stevedores engaged by the receiver, and at the time of these voyages there were six or seven private stevedoring companies in Karachi, and also stevedores employed by the Ministry of Food. The Ministry of Food supplied baggers and bags for the bagging of bulk wheat cargo. As the baggers bagged the wheat, the stevedores unloaded it from the ship into railway wagons (railroad freight cars) for transport to various parts of the country.

Railway wagons were allocated by the Ministry of Railways, which operated Pakistan's national railway. Haider testified that the Karachi Port Trust generally ordered wagons, but that the Ministry of Food ordered wagons directly for its own consignments of wheat because as a government agency it was not bound by the Ministry of Railways' allocation. On the other hand, Ikramullah, an assistant director of the Ministry of Food in Karachi at the time of the voyages, testified that the Ministry of Food had no control over the allocation of wagons, and that the Ministry of Railways functioned as an independent body. Moreover, Brigadier Baig, managing director of Hegge & Co., ship's agents in East Pakistan, testified to the same effect with regard to Chittagong; he said that the Berthing Committee met daily with an employee of the railway after berths had been allocated, and discussed the daily requirements for wagons; supplied with this information, the railway then allocated wagons on the basis of its assessment of need and availability.

It is conceded that there was a constant shortage of railway wagons at the Port of Karachi.

The shortages of wagons caused by insufficient supply, and by the Ministry of Railways' allocations of that supply, caused delays in discharge; further delays were caused by the shunting of wagons, which required that other wagons be moved, interrupting their loading.

Haider testified that it was possible to discharge bagged wheat onto the pier, when wagons were not available, but that it was not done because it would interfere with other vessels on the same pier.

Other sources of delay at Karachi were the shifting of cranes, which ran on tracks along the pier, power failures, late arrival and shortages of stevedores,

strikes by bagging labor, holidays (including Sundays), and bad weather.

### Chittagong

The administration of the Port of Chittagong and the procedures for entry and berthing of vessels were similar to those of Karachi.

Prevailing circumstances and customs at Chittagong were similar to those at Karachi, and caused similar delays. The Chittagong Port Rules forbade discharge of bagged wheat onto the piers, so that wagons were required.

### Chalna

Chalna was an anchorage, and had no berths. Pilots and moorings were allocated by a Berthing Committee, and the vessel's agent was responsible for entrance formalities. Moorings were allocated on a "first come first served" basis.

Cargo was discharged at moorings in the anchorage into lighters by means of the ship's derricks. Tugs were used to transport the lighters. Tugs were supplied by independent contractors, and were in short supply. Once lighters were placed alongside a vessel, they were not moved until all were loaded, and until a tug was available; as a result, discharge was generally delayed in one or more hatches once one lighter was loaded. When all the lighters were loaded, a tug took them twenty-eight miles up the river to the railhead, the trip causing further delay and aggravating the shortage of tugs.

A further source of delay was the necessity of transporting stevedores to the vessels by launch.

Finally, Chalna suffered delays common to Karachi and Chittagong, such as holidays and bad weather.

### Customary Rate of Discharge

Plaintiff offered "Shipping Guides," prepared by the Hegge firm, to Karachi, Chittagong, and Chalna, which indicate rates of discharge in each port, to support its contention that at each port there was an established customary rate of discharge which defendant was obligated to meet or else pay damages for detention. Plaintiff did not, however, prove any such customary rate of discharge; on the contrary, the evidence, particularly the testimony of Brigadier Baig, showed that there was no such customary rate of discharge, and that the rate of discharge was affected by the customs and prevailing circumstances in each port, including, as mentioned above, availability of wagons, labor supply, operability of cranes, supply of tugs, and other factors. Brigadier Baig testified that the discharge figures in the "Shipping Guides" prepared by his company were merely guides, intended to encourage those who might use the ports. The discharge figures, far from being customary rates, were merely statistical averages having little if any bearing on the discharge rate for a particular vessel on a particular day.

### Liability

■ Under both American and English law, the bill of lading constitutes, or is at least good evidence of the terms of, the contract of carriage between the carrier and the shipper, Dietrich v. United States Shipping Board Emergency Fleet Corporation, 9 F.2d 733 (2d Cir. 1925), cert. denied, 278 U.S. 647, 49 S.Ct. 82, 73 L.Ed. 560 (1928); The St. Johns N.F., 280 F. 553 (2d Cir. 1922); Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y.1953); Poor on Charter Parties and Ocean Bills of Lading § 59 (5th ed. 1968); Paynes's Carriage of Goods by Sea, 40 (8th ed. 1968); Scrutton on Charterparties and Bills of Lading Art. 1 (17th ed. 1964), particularly where, as here, the freight contract or booking note is only a bare memorandum and the bill of lading is a complete form with additional typewritten terms, which both parties have used without objection. The typewritten clause on each bill of lading providing that it is "SUBJECT TO ALL *OTHER* TERMS * * *" (emphasis added) of its respective booking note or freight contract clearly indi-

cates that the terms of those documents apply only in the absence of an applicable provision in the bill of lading.

■ The bills of lading covering voyages I, II, III, IV, V, VI, VII, and the bagged cargo part of voyage VIII contain the following printed clause:

"If the vessel's loading. or discharge is delayed through failure of shipper to supply cargo or to furnish lighterage or use of craft in discharging or to receive or remove the goods so that the vessel may load and· discharge as fast as she can, the shipper will pay for the detention of the vessel at ,the current rate in U.S. currency of charter per net register ton of the vessel every day."

These bills of lading also contain a provision that:

"All disputes arising under this bill of lading shall be decided according to English law."

This action is unquestionably a dispute arising under the respective bills of lading, and since the bills of lading contain the agreement between the parties, "the provision that English law should govern must be taken to represent the intention of both parties." Siegelman v. Cunard White Star, Limited, 221 F.2d 189, 193 (2d Cir. 1955).

■■ In the absence of an express provision in the contract, the consignee's obligation is to take delivery of his cargo within a reasonable ,time, and that obligation is the same whether the contract says nothing as to time or provides for "customary dispatch" or "as fast as steamer can deliver." [3] Scrutton on Charterparties and Bills of Lading Arts. 135, 136 & n. (g) (17th ed. 1964); 35 Halsbury's Laws of England ¶ 448 & n. (b), ¶ 650 & n. (o) (3d ed. 1961). What is a "reasonable time" depends on

"all the circumstances of the particular case, from the arrival of the ship to the completion of the unloading * * *; it is not sufficient to ascertain what would be a reasonable time in ordinary circumstances, since there is no such ,thing as a reasonable time in the abstract, and the answer to the question must necessarily depend upon the particular circumstances. The extent of the consignee's obligation is, therefore, to be measured not by reference only ,to the usual time according to the practice of the port, but by reference to the time which is in fact reasonable in the circumstances which actually exist, and the consignee fulfills his obligation, however protracted the delay may be, so long as such delay is attributable to causes beyond his control and he has acted neither negligently nor unreasonably." 35 Halsbury's Laws of England ¶ 650 & nn. (q), (r), (s), (t), (u), (a) (3d ed. 1961). See Scrutton on Charterparties and Bills of Lading Arts. 135, 136 & nn. (m), (n), (o), (p) (17th ed. 1964).

Factors to be considered are "(1) the natural conditions of the port, (2) ,the custom of the port, (3) the actual state of affairs existing at the port, and (4) the conduct of the consignee." 35 Halsbury's Laws of England ¶ 651 & nn. (d), (e), (f), (g) (3d ed. 1961); in this context, "custom" "does not mean 'custom' in the strict legal sense, but a settled and established practice of the port." Scrutton on Charterparties and Bills of Lading Arts. 135, 136 (17th ed. 1964).

The detention clause in .this first group of bills of lading does not fix a definite time for discharge, and in accordance with the principles stated above, requires only that discharge be accomplished in a reasonable time. The specific reference in the clause to lighterage applies only to delay caused by the consignee's fault, creating an unreasonable delay, and failure to furnish

---

**3.** The American Rule is different, and a clause such as "as fast as steamer can load" imposes an absolute obligation, circumstances and customs of the port notwithstanding. Steamship Co. of 1912 v. C. H. Pearson & Son Hardwood Co., 30 F.2d 770 (2d Cir. 1929).

lighterage because there is no lighterage to be had does not come within the ambit of the clause.

Plaintiff, however, argues that the defendant, the Embassy of Pakistan, and other arms of the Government of Pakistan, specifically the Port Trusts, the Ministry of Food, and the Ministry of Railways, are one and the same; therefore, those of their acts which caused delays are defendant's acts and it should be liable therefor.

■■ Delays caused by a consignee's "self-imposed inability," Scrutton on Charterparties and Bills of Lading Arts. 135, 136 (17th ed. 1964), or "attributable to his own previous engagements," 35 Halsbury's Laws of England ¶ 655 (3d ed. 1961), or occasioned by a consignee acting in its capacity as port authority, 35 Halsbury's Laws of England ¶ 655 (3d ed. 1961); Zillah Shipping Company v. Midland Railway Company [1902] 19 T.L.R. 63, C.A., are not excused. But this rule is only a specific instance of the rule that, in the absence of a fixed time, a reasonable time will be allowed to discharge. Delays caused by the consignee's own conduct will be a basis for liability for damages for detention only if the conduct was unreasonable, Barque Quilpue Limited v. Brown [1904] 2 K.B. 264, C.A.; 9 Asp.M.L.C. 596; The Cordelia [1909] P. 27; 11 Asp. M.L.C. 202; here, the delays in discharge, even if caused by the consignee's acts, were not shown to be unreasonable, but were due to the usual custom and prevailing circumstances at the ports and reasonable under the circumstances. Zillah Shipping Company v. Midland Railway Company, *supra*, is distinguishable since the port authority's acts in that case were arbitrary and unreasonable.

■ The consignee's liability for self-imposed delays does not include delays "reasonably incurred in the ordinary course of business within the contemplation of the parties." 35 Halsbury's Laws of England ¶ 655 (3d ed. 1961); Barque Quilpue Limited v. Brown, *supra*; The Cordelia, *supra*. The delays occasioned by acts of agencies of the Government of Pakistan were not only reasonable and due to the custom and prevailing circumstances of the ports, but they were within the contemplation of the parties; plaintiff was familiar with the conditions at the ports, and its agents kept it fully informed of their condition.

■ Plaintiff is not entitled to any damages for detention of its vessels on voyages I (except as stated below), II, III, IV, V, VI, VII, and the bagged cargo portion of voyage VIII.

The bill of lading covering the bulk cargo portion of voyage VIII contains the same printed detention provision as the bills of lading in the group discussed above, and also contains a typed clause across its face, which provides:

FREE DISCHARGE TO THE VESSEL—BAGGING, COST OF BAGS AND DISCHARGE EXPENSE FREE TO VESSEL. SHIPPERS AND/OR RECEIVERS TO BAG AND DISCHARGE CONTINUOUSLY INCLUDING OVERTIME PERIOD. OTHERWISE VESSEL'S DETENTION FOR SHIPPERS AND/OR RECEIVERS ACCOUNT—OCEAN FREIGHT PREPAID."

It, too, provides that English law is applicable.

■ To the extent that there is a repugnancy between the printed and the typewritten clauses, the typewritten clause will prevail. Love and Stewart, Limited v. Rowtor Steamship Company, Limited [1916] 2 A.C. 527. It appears, however, that this typewritten clause imposing an obligation to "discharge continuously including overtime period" is, under English law and unlike the American law (see below), no more pressing an obligation than a clause requiring discharge "with customary dispatch," "as fast as steamer can deliver," or "as fast as master shall require." It does not expressly render custom of the port inapplicable, and it does not obligate defendant to discharge continuously regardless of prevailing circumstances. The obli-

gation under the clause is the same as under the first group of bills of lading, to discharge in a reasonable time considering the customs and prevailing circumstances in the port. Scrutton on Charterparties and Bills of Lading Arts. 135, 136 & n. (1) (17th ed. 1964); as with the first group of voyages, plaintiff did not prove that the time spent discharging the vessel was unreasonable. Plaintiff is not entitled to recover damages for detention of its vessel with regard to the bulk cargo portion of voyage VIII.

The bills of lading covering voyages IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII and XXIV contain the following printed clause:

"If the vessel's loading or discharge is delayed through failure of shipper, consignee, receiver and/or owner of the goods to supply cargo, to furnish lighterage or use of craft or to deliver, receive or remove the goods or supply sufficient labor when the goods are to be loaded or discharged free of expense to the vessel so that the vessel may load and discharge as fast as she can, in any state of weather, continuously day and night, 24 hours per day, Sundays and Holidays included, notwithstanding custom of tradition or port, the shipper, consignee, receiver and/or owner of the goods will pay for the detention of the vessel at the daily current rate of the vessel's charter to the carrier, plus 25% to cover carrier's overhead expenses and fuel and, if owned by the carrier, at the daily market value for the use of similar vessel plus 25% to cover carrier's overhead expenses and fuel."

and in addition, except for the bills of lading covering voyages IX, X, and XII, contain the typewritten clause in the bill of lading covering the bulk cargo portion of voyage VIII, quoted above. The typewritten clause is not in conflict with the printed clause, being only a more compressed version, and the bills of lading for all these voyages will be treated as one group.

These bills of lading do not contain a choice of law provision. Since there is no basis for applying English law in the absence of a provision in the bill of lading, and the provisions of no other law having been brought to the court's attention, the general maritime law of the United States is applicable. A provision that a consignee shall discharge "continuously" is an express covenant to do precisely that, and is binding regardless of prevailing circumstances or customs in the port. The consignee was required to discharge continuously, twenty-four hours per day, every day, at each port, with no exceptions; accordingly, defendant is liable to pay damages for detention for all delays to plaintiff's vessels caused by its failure, regardless of fault, to fulfill that obligation. Tweedie Trading Co. v. Strong & Trowbridge Co., 195 F. 929 (2d Cir. 1912); see Steamship Co. of 1912 v. C. H. Pearson & Son Hardwood Co., 30 F.2d 770 (2d Cir. 1929).

This obligation, however, begins only when the vessel is at a berth or anchorage, and computation of damages for detention commences only with the start of the next working period after the vessel was berthed or at anchorage. The parties agree that delays resulting from failure of the vessel's winches or from rain (notwithstanding the language of the clause) are also not to be considered in computing damages.

Plaintiff is entitled to damages for detention of its vessels on voyages IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII and XXIV.

In a letter to James Finley & Co., Ltd., agent for Hellenic Lines, dated February 2, 1962, the Ministry of Food admitted that it was at fault because of its failure to berth the S/S HELLENIC SKY on voyage I soon enough and had caused delay in the amount of 15 days, 20 hours and 30 minutes. Accordingly, defendant is liable to plaintiff for damages for detention of the HELLENIC SKY on voyage I for that period.

*Damages*

Plaintiff is entitled to damages for the detention of its vessels on voyage I, IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, and XXIV. The detention clause in the bills of lading covering these voyages provides that damages for detention as to vessels owned by Hellenic should be calculated "at the daily market value for use of similar vessel," and as to chartered vessels "at the daily current rate of the vessel's charter to the carrier," and, with the exception of the bill of lading in voyage I, "plus 25% to cover carrier's overhead expenses and fuel." Plaintiff's expert witness, Jules Bingham, a ship broker, testified to the daily market value of the vessels owned by Hellenic as of their contract dates, and damages will be computed on the basis of those values, as follows:[4]

| | | |
|---|---|---|
| I. | S/S HELLENIC SKY<br>Contract of January 2, 1958 | $ 900.00 per day |
| IX. | S/S HELLENIC SPLENDOR<br>Contract of November 4, 1960 | 1,650.00 " " |
| X. | S/S HELLENIC DESTINY<br>Contract of November 4, 1960 | 1,650.00 " " |
| XI. | M/V HELLENIC TORCH<br>Contract of February 8, 1961 | 1,500.00 " " |
| XII. | M/V HELLENIC SAILOR<br>Contract of May 1 and May 9, 1961 | 1,300.00 " " |
| XIII. | M/V HELLENIC HERO<br>Contract of June 15, 1961 | 1,675.00 " " |
| XVI. | S/S HELLENIC DESTINY<br>Contract of November 14, 1961 | 1,650.00 " " |
| XVII. | M/V HELLENIC LAUREL<br>Contract of November 14, 1961 | 1,650.00 " " |
| XVIII. | M/V HELLENIC GLORY<br>Contract of June 14, 1961 | 1,475.00 " " |
| XIX. | M/V HELLENIC SPIRIT<br>Contract of March 14, 1962 | 1,500.00 " " |
| XX. | M/V HELLENIC HERO<br>Contract of June 20, 1962 | 1,450.00 " " |
| XXI. | M/V HELLENIC SAILOR<br>Contract of June 20, 1962 | 1,150.00 " " |
| XXII. | M/V HELLENIC LAUREL<br>Contract of August 22, 1962 | 1,450.00 " " |
| XXIII. | M/V HELLENIC SPIRIT<br>Contract of August 22, 1962 | 1,475.00 " " |
| XXIV. | M/V HELLENIC GLORY<br>Contract of December 4, 1962 | 1,300.00 " " |

---

4. With respect to voyages XIII, XVIII, XXI, XXII, and XXIII, Bingham expressed his opinion that the daily market value of the vessel would range between a high and low. The low has been used.

The per day charter value of the S/S HONG KONG EXPORTER, voyage XIV, and the M/V HERLAND, voyage XV, were stipulated to be $1,166.66 per day and $1,062.50 per day, respectively.

### Conclusion

For the foregoing reasons, plaintiff's claims for the detention of plaintiff's vessels in voyages I (except as to the delay in berthing), II, III, IV, V, VI, VII, and VIII will be dismissed.

Defendant is liable to the plaintiff in damages for the delay in berthing the HELLENIC SKY in voyage I for a period of 15 days, 20 hours, and 30 minutes, computed at the rate of $900 a day.

Defendant is liable to the plaintiff in damages for the detention of plaintiff's vessels in voyages IX, X, XI, XII, XIII, XIV, XV, XVI, XVII, XVIII, XIX, XX, XXI, XXII, XXIII, and XXIV, for the periods of delay shown in the schedule of stipulated facts (excluding delays caused by rain or by the ship's winches) prepared by plaintiff pursuant to stipulation at trial.

Damages are to be computed on the basis of the rates above set forth and, with the exception of voyage I, plus 25%.[5]

The judgment will provide for interest at the rate of 6% per annum from the date of entry.

The foregoing constitutes the court's findings of fact and conclusions of law, F.R.Civ.P. 52(a).

Settle judgment on notice.

---

5. Thus, on voyage XVII of the HELLENIC LAUREL, there were the following delays:

| Date | Cause | Delay |
| --- | --- | --- |
| February 19, 1962 | Bags and labor late | 0700—0900 |
| February 21, 1962 | Cranes inoperative | 1130—1300 |
| | Total delay: | 3½ hours |
| | | or 14.58% of one day. |

Daily market value of the HELLENIC LAUREL was $1,650.00 per day. Therefore, the delay of 3½ hours equals 14.58% of one day or $240.57, plus 25% or $60.14, totalling $300.71.