## THE ILE DE SUMATRA. SOCIÉTÉ TRANSOCEANIQUE DE TRANSPORTE v. SCHNELL et al. SCHNELL et al. v. SOCIÉTÉ TRANSOCEANIQUE DE TRANSPORTE.

(District Court, S. D. New York. November 16, 1922.)

1. Principal and agent ⊙⟹137(1)—Shipping ⊙⟹132(3)—Principal estopped to deny authority of agent to sign instrument on which principal relies; burden held to rest on shipowner to prove limitation of authority of agent.

　　Where a shipowner relies on exceptions in the bills of lading to relieve it from liability for damage to cargo, it is estopped to deny the agency of the person who signed the bills in its behalf, and has the burden to prove his want of authority to make a further contract with respect to the shipment.

**2. Shipping ⬦108, 125—Contract with respect to perishable shipment held valid; stopping ship as deviation.**

A contract, made by the agent of a shipowner with respect to a large early shipment of Spanish onions, that the ship should carry no other onions, and fixing the number and order of other ports at which she should call, *held* not contradictory of the bills of lading, but to be construed as a part thereof, and the stopping of the ship at other ports, involving delay, *held* a deviation, which deprived the owner of the benefit of exceptions in the bills of lading relating to damage to the shipment.

In Admiralty. Suit by the Société Transoceanique de Transporte, as owner of the steamship Ile de Sumatra, against Harry Schnell and Samuel Schnell, doing business as H. Schnell & Co., with cross-libel. Libel dismissed, and decree for respondents on cross-libel.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City (R. S. Erskine, of New York City, of counsel), for the Société Transoceanique de Transporte.

Joffe & Joffe, of New York City (Joseph Joffe, of New York City, of counsel), for H. Schnell & Co.

WARD, Circuit Judge. This is a libel by the owners of the steamer Ile de Sumatra to recover expenses incurred by them in disposing of a part of a shipment of onions condemned by the board of health of the city of New York, and a cross-libel by Schnell & Co. to recover of the shipowners for damage to the onions.

[1, 2] If the bill of lading only were before me, I think the exceptions of damage caused by heating in holds and what is translated as faultiness of the goods would cover these onions, and that the burden of proof would be on Schnell & Co. to show the shipowners' negligence in connection with it. This could be done, even if the direct cause of the damage was heat, and vice propre, by proof of an unjustifiable prolongation of the voyage.

But the documents of June 27 and 28 must also be considered. They were executed by one Ibanez as agent of the shipowners. Agency may be proved circumstantially as well as expressly. The proof is that Gil, Schnell & Co.'s agent, originally arranged with Ibanez to bring this steamer from Marseilles to load the shipment of onions which Schnell & Co. had purchased of one Carda at Gandia. The terms of the negotiation were put in writing, and time was obviously of the essence of the contract, first, because Schnell & Co. wanted the prestige of receiving at New York the first shipment of Spanish onions; and, second, because of the perishable character of the onions. These considerations made it very important, both that no shipments of onions by other persons should be carried on the steamer, and that the number of ports at which she should be allowed to call and the order in which she should call should be fixed.

The authority of Ibanez to act for the steamer is shown by the fact that he did bring her to Gandia for the onions, that he prevented her master from taking shipments of onions which had been offered by other parties, and that he signed the bills of lading for the onions shipped by Carda consigned to Schnell & Co. As the shipowners rely upon

exceptions in the bills of lading, they are estopped from denying the authority of Ibanez as to them.

The shipowners in their pleadings deny any knowledge or information sufficient to form a belief as to the authority of Ibanez to act for them, and offered no proof on the subject whatever. This is a fact which must have been within their own knowledge, and they will have to go further than to say they do not know whether he was their agent or not, inviting Schnell & Co. to prove it if they can. I think the authority of Ibanez in the premises has been sufficiently proved.

The onions were shipped at Gandia under these original documents of June 27 and 28, and they did not contradict the bills of lading subsequently signed, but merely explained them. They are to be treated as if written into the bills of lading, prevailing on familiar principles over conditions in the printed form which are inconsistent.

As the steamer did not touch at the Spanish ports in the order and to the number the agreements required, viz. she went from Gandia to Alicante, then back to Valencia, and then forward again to Gibraltar, the shipowners committed a voluntary deviation, which deprives them of all the exceptions of the bills of lading relating to damage to the shipment, and, being common carriers, they became insurers, except against the act of God and the public enemy.

The shipowners argue that the agreement of June 28 confines their liability to damage proved to have been caused by calling at the ports of St. Michaels and Fayal after leaving the last Spanish port. But I think this in no way affected their liability for the prior breach of their contract of June 27. The document of June 28 describes itself as supplemental to the agreement of June 27, and it extended the privilege of touching at ports after leaving the last Spanish port, provided that the owners should be responsible for all damage thereafter occurring except because of the act of God. The supplemental agreement of June 27 seems to me to assume that the contract as to the number of Spanish ports to be touched at and the order in which they were to be touched at has been performed. It cannot be supposed that the parties intended to permit the steamer to run up and down the Spanish coast, say for two months, and, after the onions had rotted by this prolongation of the voyage, escape all liability by touching at St. Michaels and Fayal on the way from the last Spanish port to New York.

Coming, now, to the claim of the shipowners for expenses incurred by them in removing the rotten onions from the wharf at New York. The board of health would not permit any onions to be removed until the bad had been separated from the good. Schnell & Co. did separate them, and the bad, amounting to 5,682 crates and 8 cases, were condemned by the board of health, and the shipowners were required to remove them to be dumped at sea. The expenses they incurred in so doing cannot be recovered of Schnell & Co.; they themselves being responsible for the damage to the onions, as I have held.

There will be a single decree, dismissing the libel of the shipowners, with costs, and with the usual interlocutory provisions in favor of Schnell & Co.