ALCOA S. S. CO., Inc., v. ELMHURST CONTRACTING CO., Inc.

ELMHURST CONTRACTING CO., Inc., v. ALCOA S. S. CO., Inc.

Nos. A–17168, A–17400.

District Court, E. D. New York.

June 14, 1945.

Kirlin, Campbell, Hickox & Keating, of New York City (Clement C. Rinehart, of New York City, of counsel), for libelant.

T. Vincent Quinn, U. S. Atty., of Brooklyn, N. Y. (Clarence S. Eastham, Sp. Asst. to Atty. Gen., of counsel), for Elmhurst Contracting Co., Inc.

BYERS, District Judge.

In the first cause, libelant, described as chartered owner (to be called owner) of the Norwegian S. S. MARPESIA, sues to recover additional freight moneys from respondent under a voyage charter or contract of affreightment from Mobile, Alabama, to Georgetown, British Guiana, dated April 30, 1942, concerning a voyage as to which the ship was expected to be ready on May 3, 1942.

The second cause is asserted in a cross-libel filed by respondent to recover an alleged overpayment of freight moneys in connection with the same voyage, and unliquidated damages; the cross-libel was filed when it became known to proctors that such affirmative claims are available in the Admiralty only as an offset.

It was stated at the hearing that the United States appears for the respondent by virtue of a cost-plus contract which it had with the latter, but there is nothing of record on the subject.

The facts are not in dispute; are stipulated in part, and may be summarized thus:

The voyage charter provided a lump sum freight payment for the carriage of a cargo of cement from Mobile to Georgetown, and lay days were stipulated; loading and discharge were to be within a total of eight running days, and demurrage was at a stipulated rate, under conditions not requiring recital. The following provisions are to be noticed:

"12. The rate of freight or lump sum freight charge hereinbefore provided is calculated on the basis of a port to port voyage of 12 running days, commencing from time of Vessel's normal readiness to sail from loading port until time of arrival at port of discharge, and it is hereby mutually agreed that for all time consumed by the Vessel on such voyage in excess of 13 running days the Charterer shall pay Owner $875 United States Currency per day or pro rata for part of a day; it being understood, however, that any delay to Vessel or loss of time during the period provided for above caused by deficiency of men or stores, breakdown, damages to or defect in hull, machinery, or equipment, fire, grounding, detention by average accidents to ship or cargo, or by any other cause preventing the full working of the Vessel for which the Owner is responsible or caused by damages resulting from enemy action against the Vessel, shall be excepted."

"17. The Vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the purpose of saving life and property. The Vessel to have the privilege of bunkering before and/or after loading, also enroute. Should the Vessel put into a port of distress, or be under average, Vessel shall be consigned to an agent designated by Charterer, Owner paying said agent the customary fee for attending to the Vessel's business."

"21. The Vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the Vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having under the terms of the war risk insurance on the Vessel the right to give any such orders or directions.

"If in compliance with the provisions of this clause anything is done or is not done, such not to be deemed a deviation."

"22. This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April 16, 1936 [46 U.S. C.A. § 1300 et seq.], which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further."

"23. This Agreement is subject to approval of the United States Maritime Commission and any conditions imposed by said Commission pursuant to the Ship Warrants Act (Public Law 173, 77th Congress) [50 U.S.C.A.Appendix, § 1281 et seq.]."

The ship arrived in Mobile on Saturday, May 2, 1942; started loading this cargo on the following Monday, May 4th, and completed the operation on May 5th at 2:10 P.M. She was seaworthy in all physical respects, but lacked a chief engineer who had been taken ill and removed to a hospital on May 2nd.

The master promptly telephoned to the Norwegian Consul in Mobile, and a shipping office in New Orleans, in an effort to procure a chief engineer of Norwegian certification as required by the registration of the ship. These efforts were unsuccessful, and he then telephoned or telegraphed to the Norwegian Shipping and Trade Mission in New York, and through that agency a qualified chief engineer was found in Baltimore, who traveled by plane to Mobile where he arrived on the morning of May 8th.

Application for naval clearance at Mobile was granted on May 7th at 4:30 P.M., and a half hour later was rescinded as to this and all other vessels then in port, because of the presence of enemy submarines in the Gulf of Mexico.

This restriction was removed and all vessels in that port were permitted to sail on May 13th at 11:40 A.M., at which hour departure for Georgetown was had.

On May 28th at 3:50 A.M. the vessel arrived at Georgetown and anchored, awaiting orders.

Twenty hours were lost on May 24th and 25th by reason of the ship's putting in to Port of Spain, Trinidad, with two sailors who had been rescued at sea from a torpedoed American merchantman.

The libelant Alcoa asserts that the vessel's "normal readiness to sail from loading port" (paragraph 12 above) was 9:30 A.M., May 8, 1942 (when the new chief engineer arrived on board); that it was delayed until 11:40 A.M., May 13th, because of the action of the Naval Authorities above stated, and that 19 days, 18 hours and 30 minutes were consumed in the voyage which terminated May 28th at 4:00 A.M., which was 6 days, 18 hours and 30 minutes in excess of the 13 running days stipulated in said paragraph 12, which, computed at $875 per day, amounted to $5,924.63, of which but $1,032.99 was paid, leaving the balance sued for of $4,891.64 now due.

The cross-libel asserts that the said $1,032.99 was paid "in ignorance of the true facts and circumstances surrounding the delay and dispatch of the Marpesia and the prosecution of her voyage" and in effect that the illness of the original chief engineer and the consequent delay in filling his post were faults and neglects on the part of the libelant, resulting in the failure to provide a seaworthy ship properly manned, etc., upon the completion of loading (on May 5th at 2:10 P.M.) whereby the vessel did not sail and prosecute her voyage with reasonable dispatch after loading; that this caused additional expense in hiring skilled labor "pending the arrival of the Marpesia's cargo", and other losses and damages which on March 26, 1945, the date of filing the cross-libel, had not been "presently ascertained", as to which leave to amend and specify is sought.

The time, in addition to nearly two years already elapsed, required for perfecting this calculation is not specified.

It will be seen that the question for decision is whether the cost of the delays at Mobile, and at sea in saving life, are to be visited upon the owner or the charterer. Apparently no prior decision is available which is factually comparable to this controversy.

For convenience in examining the contractual obligations here presented, the following seem to be appropriate considerations:

1. If the vessel had not been hampered by the absence of a chief engineer on May 5th when loading had been completed, her "readiness to sail" would have occurred at 2:10 P.M., and the 12 running days contemplated by paragraph 12 would have started.

2. Since there was no chief engineer on board at that time, she suffered from a "deficiency of men", which continued until May 8, 1942, at 9:30 A.M., and consequently the voyage could not be undertaken until the latter day and hour.

If the libelant were seeking to recover for any excess freight charge during that period, it could not succeed according to the provisions of paragraph 12; but that is not the purpose, since Article Sixth of the libel alleges that the loading had been

completed on May 8th at 9:30 A.M., when the vessel was in readiness to sail from Mobile.

Thus it appears that for the period from May 5th at 2:10 P.M. until May 8th at 9:30 A.M. the readiness to sail was deferred for the reason stated; also that from May 7th at 5:00 P.M. the vessel could not have sailed by reason of the action of the Naval Authorities in closing the port, so that there were two disabilities for the period of 18½ hours next ensuing, for the second of which no display of diligence by the owner would have availed to initiate the voyage, since it is assumed that the brief interval between 4:30 and 5:00 P.M. (the time of rescission of clearance) on May 7th would have been insufficient to enable the Marpesia to put to sea.

The respondent argues that there was a default on the owner's part, within paragraph 12, because of the failure to provide a chief engineer by the time that loading of cargo had been completed on May 5th, but I do not think the proviso which excludes liability for excess freight should be so construed. It has to do with conditions under which such liability shall not arise, namely, a deficiency of men or stores traceable to "any delay to Vessel or loss of time *during the period provided for above* (italics supplied) * * *", namely, "commencing from time of Vessel's normal readiness to sail from loading port * * *".

Since the readiness to sail on the part of the Marpesia did not occur until the morning of May 8th, the delay in procuring the chief engineer did not arise during any period of time which was set in motion by *readiness to sail*.

There can be no criticism of the promptness with which this deficiency was sought to be remedied, nor can it be argued that the loading should not have started on May 4th after the chief engineer had been removed to the hospital, for until the effort was made to replace him, no one could know that it would fail prior to the completion of the loading operation. To have delayed the latter in anticipation of the failure promptly to obtain a qualified engineer, would have revealed a complete lack of understanding of the necessities of the business at hand.

Thus far it seems clear that the libelant's cause must be judged upon the basis of the obstacle which had been interposed by the Naval Authorities at Mobile, to the commencement of the voyage on May 8, 1942, at 9:30 A.M., for at that hour the vessel was in a condition of readiness to sail, within the terms of this voyage charter.

3. The vessel then was unable to proceed to sea, and that condition continued until May 13th at 11:40 A.M., by reason of the said action of the Naval Authorities.

There is an element of hardship involved, wherever the loss so occasioned is directed to fall, since neither party was responsible for the cause, and resort must be had to the contract to ascertain whether it can be fairly interpreted to have contemplated such a possibility.

Paragraph 21, which provides that the vessel has. liberty to comply with any directions "as to departure * * * given by any * * * Government * * * having * * * the right to give any such orders or directions", seems to indicate that such an intervention as happened was envisaged by the contracting parties; in an independent clause, so far as punctuation is concerned, it is stipulated that action or inaction pursuant to the foregoing is not to be deemed a deviation.

Is it equally apparent that such action or inaction, if it occurs after readiness to sail, shall not postpone the incidence of the freight charge for the purpose of computing the duration of the voyage?

An answer to this question lies in the terms which specify the exceptions to the charterer's obligations to pay extra freight as set forth in paragraph 12: "deficiency of men or stores, breakdown, damages to or defect in hull, machinery or equipment, fire, grounding, detention by average accidents to ship or cargo, or by any other cause preventing the full working of the Vessel for which the Owner is responsible or caused by damages resulting from enemy action against the Vessel".

Since the calculation of extra freight moneys is not excused as to the charterer by any of the foregoing exceptions, it would seem to follow, as a matter of logic, that they must be included in computing its liability for a voyage that was extended after the readiness to sail, by the intervention of Governmental Authority. The owner was under its own expense for maintaining the vessel and crew during this period of enforced idleness; to that extent the vessel

was deprived of its earning capacity although all operating expenses except for fuel consumption were being incurred; since delays which extended the voyage beyond the period of 13 running days, not attributable to fault on the part of the owner, were contracted to be paid by the charterer, it would seem that these charges must take that course, unless the cases hold otherwise.

4. The 20-hour delay, in saving the two sailors who were adrift in the open sea on a life-raft, is thought to be governed by even more precise agreement. In paragraph 17 it is provided in terms that the vessel is to be permitted to deviate "for the purpose of saving life and property".

This clearly implies that the voyage may be prolonged, i.e., extra freight money may be incurred under such circumstances. The proof is that an extension of 47 miles was involved through putting into Port of Spain with these two survivors of the torpedoing of an American merchant ship.

The 20 hours so occupied may be thought of as having inured to the benefit of the United States, which is defending this cause.

It now becomes necessary to ascertain if the cases relied upon by the respondent point to a construction of the contract obligations assumed by these parties, other than that above suggested:

The Henry W. Cramp, 3 Cir., 20 F.2d 320. Here a vessel which had deviated was held not excused for failure to comply with the terms of her charter-party, because of an embargo which became operative (in 1917) after she had reached the port of Norfolk to which she was held to have deviated.

That decision does not bear on a case in which no breach of the voyage charter has been shown.

M. O. H. of West Indies, Inc., v. Christoffer Hannevig, Inc., 2 Cir., 264 F. 311. Action at law to recover for demurrage alleged to be due because of charterer's default whereby the vessel was detained at San Domingo beyond the 15 lay days provided in the charter for loading. The vessel was shown to have been denied clearance (after loading had been completed within the stipulated time) by the United States authorities.

The owner was denied recovery because the charterer was protected by the terms of the charter against the restraint of princes, etc., and additionally because no liability for demurrage could have arisen, on the ground of vis major.

In that case the plaintiff undertook to prove that the charterer was in default whereby demurrage was incurred, and failed in the effort. Here there is no default alleged in the sense that liquidated damages for delay are sought to be exacted. The libelant's theory is that the extra freight was incurred because the voyage proved to be of greater duration than the parties expected it to be, but there is no assumption of burden of proof that the result is to be traced to anything resembling default in performance on the part of charterer.

Crossman v. Burrill, 179 U.S. 100, 21 S. Ct. 38, 45 L.Ed. 106. Here again the charterer was exempt from demurrage since the discharge of cargo in Rio de Janeiro in 1893 was rendered impossible through vis major, i.e. bombardment of forts in the port by hostile ships of war.

Berwind-White Coal Mining Co. v. Solleveld, etc., 4 Cir., 11 F.2d 80. Here demurrage as claimed was allowed, it appearing that the vessel was already in default, i.e., "on demurrage", when the orders of the Coal Administrator (1919) prevented her from taking her cargo as contracted for.

The possible bearing of this case in support of respondent's position is not understood.

Thomas Bell & Co. v. Stewart, 5 Cir., 31 F.2d 44, is equally remote, and involves the recovery of demurrage in view of default by charterer and the consignee of the cargo.

Varagnolo v. Partola Manufacturing Co., 209 App.Div. 347, 204 N.Y.S. 577. Action to recover damages by purchaser of caustic soda, wherein it appeared that the seller was in continuing default, which was held not to have been waived by the purchaser, and therefore that the complaint should not have been dismissed. Defendant's inability to perform, through interdiction by the government in refusing an export license, did not arise until months after the default occurred. Again it is not seen what bearing the case has upon this controversy.

It thus appears that there is no obstacle to the decision of this controversy which is thought to be required by the terms of this charter, residing in any case which has been cited or discussed for the respondent.

Reference to the alleged immunity of respondent by reason of the provisions of the Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304, touching "loss or damage sustained by the carrier", incorporated by reference into paragraph 22 of this charter, seems not to be apposite. This is not a claim for loss or damage.

The respondent's cross-libel is entirely unsupported by evidence tendered on its behalf, and will therefore be dismissed.

The libelant may have a decree with interest and costs as prayed, to be settled on notice.