**HELLENIC LINES, LIMITED, Plaintiff-Appellee-Appellant,**

v.

**The EMBASSY OF PAKISTAN, Defendant-Appellant-Appellee.**

**Nos. 755, 756, Dockets 35353, 35436.**

United States Court of Appeals, Second Circuit.

Argued May 24, 1972.

Decided Sept. 11, 1972.

Robert V. Corbett, New York City (Christophil B. Costas and Cardillo & Corbett, New York City, on the brief), for plaintiff-appellee-appellant Hellenic Lines, Limited.

Morton Zuckerman, New York City (Dunn & Zuckerman, New York City, on the brief), for defendant-appellant-appellee Embassy of Pakistan.

Before LEVENTHAL,* FEINBERG and TIMBERS, Circuit Judges.

TIMBERS, Circuit Judge:

These appeals present somewhat difficult questions of construction of certain technical terms of contracts of affreightment entered into between Hellenic Lines, Limited, and the Embassy of Pakistan.

Pursuant to such contracts, Hellenic's vessels between 1958 and 1963 carried twenty-four shipments of grain from ports in the United States to ports in Pakistan and what was then East Pakistan. In March of 1964, Hellenic filed a libel seeking damages for delays in berthing its vessels and discharging the cargoes.[1] After a trial in the District Court for the Southern District of New York, Judge Bonsal, 307 F.Supp. 947, held that the Embassy was liable for the detention of Hellenic's vessels on those voyages (IX through XXIV) governed by American law and was not liable for detention on those voyages (II through VIII) governed by English law.[2] For the reasons stated below, we affirm in part and reverse in part on the appeal of

the Embassy and affirm on the cross-appeal of Hellenic.

I.

Each of the contracts covering the twenty-four shipments of grain to Pakistan consisted of a booking note or a freight contract and a negotiable bill of lading issued by Hellenic when the cargo was loaded on board one of its vessels. The booking notes or freight contracts were entered into by the parties in Washington, D.C. or New York City sometime prior to the respective shipments. These documents were skeletal memoranda, setting forth only the barest terms of a contract of affreightment. Each booking note or freight contract generally stated the name of a vessel, the place of loading, dates within which loading would occur, port of discharge, the commodity and its quantity and the freight rate. All of the documents, with the exception of one, also indicated that cargo would be discharged free of risk and expense to the vessel and that "otherwise regular berth terms apply". Seven of these booking notes also added "no demurrage".

The negotiable bill of lading issued for each shipment was a standardized printed form with the terms of the applicable freight contract typewritten onto the form. A typewritten clause in each bill of lading also specifically provided that the bill of lading was "subject to all other terms, conditions and exceptions of the" relevant freight contract. The bills of lading for voyages II through VIII stated that "[a]ll disputes arising under this bill of lading shall be decided according to English law." The bills of lading for the last sixteen voyages did not contain a choice-of-law pro-

---

* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. The Embassy of Pakistan cross-claimed for alleged shortages in seven of the twenty-four shipments. This cross-claim was dropped prior to trial.

2. Although voyage I was governed by English law, in a letter dated February 2,

1962 to Hellenic's agent, the Ministry of Food for Pakistan admitted that it was at fault for its failure to berth Hellenic's vessel soon enough and that it had caused delay to the extent of 15 days, 20 hours and 30 minutes. The district court therefore held the Embassy liable for this delay arising out of voyage I. We affirm that holding.

vision. The district court correctly held, however, as the parties conceded, that the general maritime law of the United States was applicable to disputes arising out of these voyages.

The cargo on each of the twenty-four voyages was discharged at one of three ports—Karachi in Pakistan or Chittagong or Chalna in what was then East Pakistan. Congestion at these ports caused substantial delays in berthing or mooring Hellenic's vessels. Judge Bonsal also found that additional delays in discharging the cargo were attributable in large measure to the absence of modern facilities and a shortage of existing equipment. In particular, at Karachi and Chittagong, bagged wheat had to be loaded onto railway freight cars, and substantial delays resulted from the critical shortage of such cars. At Chalna, cargo was unloaded at moorings in the anchorage into lighters by means of the ship's derricks. Tugs were then required to transport the lighters, and a shortage of tugs caused substantial delays. In all three ports, a shortage of stevedores, power failures, breakdown of equipment, labor strikes and bad weather also hampered the effort to unload the vessels in a timely fashion. Taken together, Hellenic claimed that the delays in discharging the cargoes for all twenty-four shipments amounted to approximately 134 days.

The district court specifically rejected the claim, however, that the Embassy was at fault for the delays in discharging the cargoes. It found that the delays "were due to the usual custom and prevailing circumstances at the ports and reasonable under the circumstances", and it also concluded that the delays "were within the contemplation of the parties". The court then held that the bills of lading governed by Eng-

lish law merely required the consignee to discharge the cargo within a reasonable time and that, in view of the circumstances existing at the ports, the Embassy had not breached this duty. Accordingly, the court absolved the Embassy of any liability for detention arising out of voyages II through VIII. On those voyages governed by American law, however, the court held that the bills of lading imposed an absolute duty on the consignee to discharge the cargo continuously, regardless of the prevailing circumstances at the ports. The court therefore held the Embassy liable for detention arising out of voyages IX through XXIV.

II.

On its cross-appeal, Hellenic contends that the district court erred in denying it damages for detention arising out of those voyages controlled by English law. We disagree.

The bills of lading covering these voyages contained the following printed clause:[3]

"If the vessel's loading or discharge is delayed through failure of shipper to supply cargo or to furnish literage or use of craft in discharging or to receive or remove the goods so that the vessel may load and discharge as fast as she can, the shipper will pay for the detention of the vessel at the current rate in U. S. currency of charter per net register ton of the vessel every day."

If no fixed time for unloading is stipulated, the law implies an agreement on the part of the consignee to discharge the cargo within a reasonable time. Carver, Carriage by Sea 1245 (11th ed. 1963); Scrutton on Charterparties and Bills of Lading, Arts. 135, 136 (17th ed.

---

3. The bill of lading covering the bagged cargo portion of voyage VIII did contain the clause quoted above. The bill of lading covering the bulk cargo portion of voyage VIII also contained a typed clause across its face which provided for "[s]hippers and/or receivers to bag and discharge continuously including overtime period". Under English law, a provision for continuous discharge imposes no greater obligation than one to unload the cargo "so that the vessel may load and discharge as fast as she can." See Scrutton on Charterparties and Bills of Lading, Arts. 135, 136 n. l (17th ed. 1964).

1964). Moreover, under English law, the time is unfixed whenever there is not a definite time expressed or implied. Thus, the obligation to discharge in a reasonable time is the same whether the bill of lading is silent as to the time, or stipulates for "customary dispatch" or "as fast as steamer can deliver". Scrutton on Charterparties and Bills of Lading, Arts. 135, 136 n. g. (17th ed. 1964). Furthermore, under English law, a reasonable time means "reasonable under the circumstances then existing other than self-imposed inabilities of either shipowner or charterer and should be estimated with reference to the means and facilities then available at the port, and the character of the port with regard to tides and otherwise". Scrutton on Charterparties and Bills of Lading, Arts. 135, 136 (17th ed. 1964). In short, the question is whether the consignee did what could be reasonably expected of it.

■ After reviewing the entire record, we cannot say that the district court's finding that the delays were reasonable under the prevailing circumstances of the ports is clearly erroneous. The congestion at these ports, the inadequacy of existing facilities and the shortage of stevedores were conditions which were well known to the shipping industry. These conditions produced substantial delays in discharging the cargoes from all vessels, not just Hellenic's. Even assuming, as Hellenic contends, that the Embassy had the burden of showing that it did all it could under the circumstances, we hold that the Embassy sustained that burden. We therefore agree with the district court's conclusion that the delays were "reasonable and due to the custom and prevailing circumstances of the ports" and that the Embassy is not liable for the delays on those voyages governed by English law.

### III.

■ Both parties concede that the maritime law of the United States applies to voyages IX through XXIV. The bills of lading covering these voyages provided that the cargoes would be dis-

charged "continuously" by the consignee. Under American law, as the district court correctly pointed out, a provision that a consignee shall discharge "continuously" is an express covenant to do precisely that and is binding regardless of prevailing circumstances or customs of the port. See Steamship Co. of 1912 v. C. H. Pearson & Son Hardwood Co., 30 F.2d 770, 773 (2 Cir. 1929); Tweedie Trading Co. v. Strong & Trowbridge Co., 195 F. 929, 930 (2 Cir. 1912). Accordingly, the court held that the Embassy was liable for the delay in discharging the cargoes on these voyages.

On appeal, the Embassy contends that several provisions of the booking notes or freight contracts negate the duty to discharge continuously and that the district court erred in not holding that the terms of the freight contracts prevail over inconsistent terms of the bills of lading. The district court rejected this argument, concluding that the typewritten clause in each bill of lading which provided that the bill of lading was "subject to all other terms . . . " of its respective freight contract meant that the terms of the bill of lading must control if there were any inconsistency between its provisions and those of the applicable freight contract. We cannot accept the court's analysis of the relationship between the freight contracts and the bills of lading.

To hold that language in the bill of lading prevails over inconsistent language in the freight contract would permit Hellenic to change unilaterally the terms of an already existing contract. As the Supreme Court said in Northern Pacific Railway Co. v. American Trading Co., 195 U.S. 439, 462–63 (1904):

"It is urged that the bill of lading constitutes the sole contract. But there was a plain valid contract existing between the parties before the lead was shipped and before any bill of lading was issued. That special contract was to forward the lead by the steamship leaving Tacoma on October 30. The next day after the lead was shipped at Newark, a bill of lad-

ing was delivered to one of the clerks of the trading company, and that bill of lading contains the absolutely inconsistent statement that the carrier is not to be liable for any loss not occurring on its own road, . . .

\* \* \*

The railroad company has no power alone to alter that contract, and it could not alter it by simply issuing a bill of lading, unless the other party assented to its conditions and thereby made a new and different contract."

In Toyo Kisen Kaisha v. W. R. Grace & Co., 53 F.2d 740 (9 Cir. 1931), the court considered the relationship between a document analogous to the freight contract at issue in this case and a bill of lading. The court concluded that "[s]hould there exist . . . an irreconcilable repugnancy between the prior written contract and the bills of lading, that conflict would have to be resolved in favor of the former." 53 F.2d at 742. A similar conclusion was reached in The Ile de Sumatra, 286 F. 437, 439 (S.D.N.Y.1922), where the court also rejected the argument that language in the bills of lading controlled over inconsistent language in a prior written contract:

> "The onions were shipped at Gandia under these original documents of June 27 and June 28, and they did not contradict the bills of lading subsequently signed, but merely explained them. They are to be treated as if written into the bills of lading, prevailing on familiar principles over conditions in the printed form which are inconsistent."

■ Hellenic argues that, since the Embassy used the bills of lading to obtain possession of the cargo after each of the twenty-four voyages, it impliedly assented to all the provisions of the bills of lading, even those which were inconsistent with language in the respective freight contracts. This argument, however, overlooks the fact that any implied assent to modification of the freight contracts by the bills of lading was ne-

gated by the typewritten clause in each bill of lading which provided that the bill of lading was "subject to all other terms . . . ." of its respective freight contract. Contrary to the district court's holding, the most reasonable interpretation of this phrase is that language in the freight contract must prevail over inconsistent printed language in the bill of lading. The word "other" refers to those terms of the freight contract which were not actually typewritten onto the standard bill of lading. The phrase "subject to" indicates that the terms of the bill of lading were subordinate to the terms of the respective freight contracts. Accordingly, regardless of whether a particular provision of a freight contract had been typewritten onto the bill of lading, it would nevertheless prevail over an inconsistent provision of the printed bill of lading.

We turn now to the question whether the court's error in harmonizing the bill of lading with its respective freight contract affected its holding that the Embassy was liable for detention damages arising out of voyages IX through XXIV.

■ The Embassy first contends that the freight contract clauses "otherwise regular berth terms to apply" and discharge by the consignee "free of risk of expense to the vessel" negate the continuous discharge provisions in the bills of lading covering voyages IX through XXIV. We hold that there is no inconsistency between these clauses and the continuous discharge provisions of the bills of lading. Taken together, these two provisions of the freight contracts indicate that the consignee agreed to secure a berth for Hellenic's vessels and to unload the cargo. In establishing that the consignee was responsible for berthing the vessels and discharging the cargoes, neither of these freight contract provisions dealt with the question of how quickly the consignee was obligated to fulfill its responsibilities. The fact that the clauses of the freight contracts were silent on this score does not mean that they are inconsistent with the con-

tinuous discharge provisions of the bills of lading. The clauses of the freight contracts simply did not deal one way or the other with the issue of how quickly the cargoes had to be discharged. We therefore hold that the clauses providing for "regular berth terms" and discharge by the consignee "free of risk and expense to the vessel" do not contradict the continuous discharge provisions of the bills of lading.

■■■■■ We do agree with the Embassy's second claim, however, that the "no demurrage" clause contained in the freight contracts covering voyage XV and voyages XX through XXIV preclude holding the Embassy liable for detention damages in connection with these voyages.[4] While the district court did not construe the meaning of "no demurrage", there can be little doubt that it is inconsistent with the provisions in the bills of lading that the consignee is liable for failure to discharge continuously. As the Supreme Court said in The Apollon, 22 U.S. (9 Wheat.) 362, 378 (1824), "demurrage is merely an allowance or compensation for the delay or detention of a vessel". *Accord,* Continental Grain Co. v. Armour Fertilizer Works, 22 F.Supp. 49, 54 (S.D.N.Y. 1938). Thus, the most logical interpretation of the "no demurrage" clause is that it precludes liability for detention damages. In Hellenic Lines, Ltd. v. Director General of the India Supply Mission, 319 F.Supp. 821, 831 (S.D.N.Y. 1970), aff'd on other grounds, 452 F. 2d 810 (2 Cir. 1971), Judge Bryan had occasion to discuss the meaning of "no demurrage":

> "Demurrage is defined as extended freight and is the amount payable for delays by the receiver in loading or unloading cargo. It is stipulated damages for detention . . . . It is plain that when the parties choose, they may contract out of any liability for delay in discharge.

The no demurrage clause here clearly excludes any claims against the defendant for delay in berthing the vessels or discharging the cargo, contractual or non-contractual."

We agree with Judge Bryan's interpretation of "no demurrage" and hold that the Embassy is not liable for the delays in securing berths and unloading cargoes on any of those voyages covered by a freight contract containing a "no demurrage" provision. We therefore reverse that part of the district court's judgment which held the Embassy liable for detention damages in connection with voyage XV and voyages XX through XXIV.

### IV.

■■■■ The Embassy next contends that the provisions of the bills of lading making the consignee liable for failure to discharge continuously, regardless of fault, violates § 1304(3) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1304(3)(1970), which provides:

> "The shipper shall not be responsible for loss or damage sustained by the carrier or the ship arising or resulting from any cause without the act, fault or neglect of the shipper, his agents or his servants."

The Embassy, however, has misconstrued the scope of COGSA. This act applies to the carriage of goods. The provision "loss or damage" in § 1304(3) refers to physical loss or damage to the goods. Neither this section nor any other section of COGSA was intended to limit claims for delays in discharging cargo. Detention is wholly unconnected with physical loss or damage to goods and is a matter which COGSA left to be dealt with by contract between the parties. See Alcoa S.S. Co. v. Elmhurst Contracting Co., 61 F.Supp. 6, 11 (E.D. N.Y. 1945); Carver, Carriage by Sea 230 (11th ed. 1963); 10 Williston on Contracts § 1077B (3d ed. 1967).

---

4. The freight contract for voyage V also contained a "no demurrage" clause. As indicated previously, we have held that

the Embassy was not liable for detention damages arising out of voyage V.

## V.

Finally, in computing detention damages, the district court relied upon a formula contained in a clause of the bills of lading. This clause provided that for each day of detention, the consignee was liable for damages in the amount of "the daily market value for the use of similar vessel" for vessels owned by Hellenic and in the amount of "the daily current rate of the vessel's charter hire" for vessels on time charter to Hellenic.[5] Furthermore, regardless of who owned the detained vessel, the clause provided that the consignee was liable for an additional 25% "to cover carrier's overhead expenses and fuel". The Embassy contends that this damages clause is unenforceable as it is a penalty provision and not a liquidated damages clause.

■ The controlling principle with respect to the validity of a provision for liquidated damages is not difficult to state. In Restatement of Contracts § 339 (1932), it is stated as follows:

"An agreement made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

(a) The amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) The harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."

See also United States v. Le Roy Dyal Co., Inc., 186 F.2d 460, 461 (3 Cir. 1950), cert. denied, 341 U.S. 926 (1951); 5 Williston on Contracts § 783 (3d ed. 1967). Turning first to the second part of this test, we are satisfied that damages for detention are sufficiently difficult to estimate accurately that the inclusion of a liquidated damages clause for detention in a contract of affreightment is justifed. The common practice of agreeing to a stipulated amount for damages resulting from delays in discharging cargo is a good indication of the problems involved in ascertaining with any degree of precision the actual damages caused by detention. See Gilmore and Black, The Law of Admiralty 186 (1957). Moreover, that damages for delays in general are difficult to calculate and to prove is borne out by the accepted practice in building and construction contracts of providing for liquidated damages for each day's delay in performing the contract. See 5 Williston on Contracts § 785 (3d ed. 1967).

■ As for the reasonableness of the amount stipulated as damages for detention, we hold that it was reasonable to measure the harm by referring to the daily market value of a ship of similar size and type in the case of Hellenic's vessels and to the current rate of the vessel's charter hire in the case of vessels on time charter to Hellenic.[6] Such

---

5. Only three of the vessels involved in the twenty-four voyages did not belong to Hellenic. These three vessels carried the cargo on voyages II, XIV and XV. As indicated above, the Embassy is not liable for detention damages for voyages II and XV. Accordingly, our holding with respect to detention damages for vessels on time charter to Hellenic applies only to the vessel on voyage XIV.

6. We assume that "the daily market value for the use of similar vessel[s]" and "the daily current rate of the vessel's charter hire" as to time charters, in each case consists of the dollars offered on the market for the renting of the space, with the owner being obligated to furnish the master, officers and crew who maintain the ship and operate it. This is the ordinary significance of time charter as contrasted with, e. g., "demise" charter, see Randolph v. Waterman Steamship Corp., 166 F.Supp. 732, 733 (E.D.Pa. 1958). Thus, Hellenic is not concerned with having to dilute the amounts received by its payments to the crew; rather, the amounts received were determined, on the market, as amounts to be paid by someone who would not have to make payments to the crew.

**1158**

an estimate of damages tends to approximate the amount of money Hellenic might lose by being detained in port. As the Supreme Court said in The Conqueror, 166 U.S. 110, 127 (1897), "[t]he best evidence of damage suffered by detention is the sum for which vessels of the same size and class can be chartered in the market".

 That portion of the clause, however, which compels the consignee to pay an additional 25% "to cover carrier's overhead expenses and fuel", appears to be a penalty provision. We fail to perceive how this additional sum reasonably could be included as an element of the damages resulting from detention. Hellenic argues that under time charters, in addition to paying for the use of the vessel, the charterer, Hellenic in this case, also bears most of the expenses of operating the vessel, including the cost of fuel. When a vessel is being detained, however, the cost of fuel is minimal at most. In the case of detained vessels owned by it, Hellenic does not even attempt to justify the additional 25% in damages, other than to say that these additional damages are not unreasonable. It seems to us, however, that included within "the daily market value for the use of similar vessel" is an estimate of the cost to Hellenic of operating the vessel, including the cost of fuel. Accordingly, we hold that the district court should not have enforced that portion of the damages clause which required the consignee to pay an additional 25% "to cover carrier's overhead expenses and fuel."

To summarize: we hold that the Embassy is liable for delays in berthing the vessels and discharging the cargoes only on voyages I, IX, X, XI, XII, XIII, XIV, XVI, XVII, XVIII and XIX; that the portion of the damages clause providing for an additional 25% "to cover carrier's overhead expenses and fuel" should not be enforced; and that the judgment should be reduced accordingly.

Affirmed in part and reversed in part on the appeal of the Embassy; affirmed on the cross-appeal of Hellenic.