**ASSOCIATION TECHNIQUE INTERNATIONALE DE COMPAGNIES D'ASSURANCES MARITIME ET TRANSPORTS ("A.T.I.C.A.M."), Plaintiff,**

v.

**CAST EUROPE (1983) LIMITED, Defendant and Third Party Plaintiff,**

v.

**GRAND TRUNK WESTERN RAILROAD COMPANY, Third Party Defendant.**

**No. 86 C 1420.**

United States District Court, N.D. Illinois, E.D.

June 17, 1987.

---

5. Intra in its closing argument appeared to withdraw its request for attorney fees.

**1444**

Theodore T. Scudder, Chicago; James T. Caraway, Shorewood, Wis., for plaintiff.

Michael A. Snyder, Snyder & Gerard, Chicago, Ill., for defendant and third party plaintiff.

Peter J. Crowley, Lewis, Overbeck & Furman, Chicago, Ill., for third party defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Association [1] initially sued Cast Europe (1983) Limited ("Cast Europe") for lost and damaged goods. Cast Europe then joined Grand Trunk Western Railroad Company ("Grand Trunk") as a third-party defendant under Fed.R.Civ.P. ("Rule") 14(a). Cast Europe and Grand Trunk have now moved under Rule 16 for an order limiting their liability (if any) to Association to $500 Canadian. For the reasons stated in this memorandum opinion and order, their motion is denied.

### Facts [2]

On February 5, 1985 Kuehne & Nagel and Cast Europe entered into a bill of lading agreement (the "Bill of Lading," or,

---

**1.** For simplicity's sake, this opinion will further abbreviate plaintiff's name (already reduced in the case caption to the acronym "A.T.I.C.A.M.") to "Association."

**2.** All the parties have agreed to the following facts as to the actual shipment of the furniture involved. Facts as to the procedural history of this case have been drawn from the pleadings.

where its specific provisions are referred to, "B/L ¶ __") in Paris, France, under which Cast Europe agreed to transport a container holding 41 packages of furniture (the "Container") from Serrieres De Briord, France to Chicago, Illinois. Originally the Container was loaded aboard the M/V Cast Polarbear (chartered by Cast Europe) in Antwerp, Belgium[3] and unloaded in Montreal, Canada. Canadian National Railroad then transported the Container to Port Huron, Michigan, where it arrived February 21, 1985. Grand Trunk then carried the Container to Chicago. On arrival here it was discovered the furniture in the Container had been stolen or damaged. Solely for purposes of this motion, Grand Trunk admits the damage occurred while the Container was in its possession.

Association, which had insured the furniture in the Container,[4] paid its insured $12,275 and asserts subrogation rights against Cast Europe. Because Grand Trunk is charged with responsibility for the damages to the furniture, Cast Europe seeks indemnity from Grand Trunk for any amount it may have to pay on the Association claim. Association has made no direct claim against Grand Trunk.

Cast Europe and Grand Trunk contend their potential liability is limited by B/L ¶ 10:[5]

> For the purpose of calculating liability (if any) of the Carrier in respect of goods carried in a container under any legislation whereby the Carrier is entitled to limit his liability per package, it is agreed that such container constitutes a package except as provided by such legislation where it applies, and except where a lower limit of liability is applicable under clause 9 hereof, the liability (if any) of the Carrier shall not exceed dlrs 500 Ca-

nadian currency per container lost or damaged.

Association disagrees, arguing that certain statutes bar Cast Europe from limiting its potential liability for the damage to the 41 packages of furniture in the Container to $500 Canadian.

### Choice of Law

■ Initially the parties dispute which country's law must be applied in construing the Bill of Lading. Absent an overriding agreement, general choice of law principles would look to the law of the jurisdiction where the Bill of Lading was issued. Gilmore & Black, *The Law of Admiralty* § 3–19 (1975). But here the Bill of Lading contains express provisions that must prevail over those general principles (see *Hellenic Lines, Ltd. v. Embassy of Pakistan*, 307 F.Supp. 947, 954 (S.D.N.Y.1969), *aff'd in part and rev'd in part on other grounds*, 467 F.2d 1150 (2d Cir.1972)):

> **2. Jurisdiction:**
>
> This Bill of Lading or any questions arising thereunder shall be governed by the Law of Canada where all proceedings against the Carrier hereon or hereunder are to be taken.
>
> **3. Paramount Clause:**
>
> The Hague Rules contained in the International Convention for the Unification of certain rules relating to Bill of Lading dated Brussels the 25th August 1924, as enacted in the country of shipment shall apply to this contract. When no such enactment is in force in the country of shipment, the corresponding legislation of the country of destination shall apply and when there is no such

---

**3.** None of the parties has discussed how or by whom the Container was shipped from France to Antwerp.

**4.** Although Kuehne & Nagel shipped the furniture, Roset U.S.A. Corp. apparently owned the furniture and had it insured by Association.

**5.** Association attached only a copy of the front side of a bill of lading to its Complaint. Grand Trunk attached a copy of the reverse side of that

document, which contained several "Stipulations, Exceptions and Conditions," to its present motion. Then Association attached copies of the front and reverse of another bill of lading to its memorandum opposing Grand Trunk's motion (the reverse sides of the two documents were, in fact, identical). All the parties now agree the last document (Association Mem.Ex. A) is a copy of the actual Bill of Lading for the furniture.

legislation, the terms of the said Convention shall apply.[6]

When briefing on the current motion was originally tendered, this Court viewed the parties' choice-of-law treatment as inadequate and ordered further submissions. Now all the parties have concluded that because (1) Canada has not adopted any version of the Hague Rules and (2) B/L ¶¶ 2 and 3 require the application of both Canadian law *and* the Hague Rules (which have been adopted in France, the "country of shipment"), those two paragraphs must conflict. That simply does not follow.

When read together, the two quoted paragraphs specify the parties' rights under the Bill of Lading are controlled by the Hague Rules in particular and Canadian law in general.[7] When the Hague Rules are relevant they govern, but those Rules do not cover all possible questions arising under the Bill of Lading. Canadian law applies in the resolution of issues not addressed by the Hague Rules, and the meaning of B/L ¶ 3 itself presents the first such issue.

*"Paramount Clause": The Hague Rules*

■ B/L ¶ 3 says the Hague Rules "as enacted in the country of shipment shall apply." France, the country of shipment, did adopt the 1924 Rules on January 4, 1937 (6 Benedict 1–11). Four decades later (on March 10, 1977), however, France significantly changed those Rules by adopting the Visby Amendments (6 Benedict 1–31). Whether the Visby Amendments are included as part of the Hague Rules "as enacted in [France]" is the key to determining the validity of Cast Europe's attempt to limit its liability in B/L ¶ 10.

Article 4, § 5 of the 1924 Rules (quoted at 6 Benedict 1–6) provides:

5. Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connexion with goods in an amount exceeding 100 pounds sterling per package of unit, or the equivalent of that sum in other currency unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

This declaration if embodied in the bill of lading shall be *prima facie* evidence, but shall not be binding or conclusive on the carrier.

By agreement between the carrier, master or agent of the carrier and the shipper another maximum amount than that mentioned in this paragraph may be fixed, provided that such maximum shall not be less than the figure above named.

Neither the carrier nor the ship shall be responsible in any event for loss or damage to, or in connexion with, goods if the nature or value thereof has been knowingly misstated by the shipper in the bill of lading.

That statutory language would not specifically prevent parties from agreeing on a definition of a "package of unit"—even one characterizing a "container" (though it in turn contains other units) as a "package of unit," as the parties did in B/L ¶ 10—and from thus limiting Cast Europe's potential liability to $500 Canadian for the single "container" shipped by Kuehne & Nagel.

6. [Footnote by this Court] In 1924 the International Convention referred to in B/L ¶ 3 adopted what have come to be known as the Hague Rules (see 6 Cohen, *Benedict on Admiralty* 1–2 (7th ed. 1987) (hereafter cited simply "6 Benedict—")). Many countries adopting the 1924 Rules did so in slightly varying forms. Then in 1968 a Protocol To Amend the Hague Rules of 1924, commonly called the Visby Amendments, was drafted (see 6 Benedict 1–25). Only a minority of the countries adopting the 1924 Hague Rules have also adopted the Visby Amendments. This opinion will refer to the original Convention version of the Hague Rules as the "1924 Rules," to the 1968 Protocol as "the Visby Amendments," to the 1924 Rules as amended by the Visby Amendments as the "Amended Rules" and to the generic concept—not identifying either the pristine 1924 Rules, or any variants on them, or the Amended Rules—as the "Hague Rules."

7. Cast Europe has contended B/L ¶ 2 is nothing more than a provision mandating that all actions against any carrier be brought in Canada (a requirement assertedly waived by the filing of suit here without objection from any litigant). But that reading wholly ignores the other specific language of B/L ¶ 2 that the "Bill of Lading or any questions thereunder shall be governed by the Law of Canada...."

But France's 1977 Visby Amendments replaced 1924 Rules Article 4, § 5 with the following language (quoted at 6 Benedict 1–26):

(a) Unless the nature and value of such goods have been declared by the shipped (sic, as quoted in Benedict) before shipment and inserted the bill of lading, neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the goods in an amount exceeding the equivalent of 10,000 francs per package or unit or 30 francs per kilo of gross weight of the goods lost or damaged, whichever is the higher.

\*   \*   \*   \*   \*   \*

(c) Where a container, pallet or similar article of transport is used to consolidate goods, the number of packages or units enumerated in the bill of lading as packed in such article of transport shall be deemed the number of packages or units for the purpose of this paragraph as far as these packages or units are concerned. Except as aforesaid such article of transport shall be considered the package or unit.

(d) A franc means a unit consisting of 65.5 milligrammes of gold of millesimal fineness 900'. The date of conversion of the sum awarded into national currencies shall be governed by the law of the Court seized of the case.

\*   \*   \*   \*   \*   \*

(g) By agreement between the carrier, master or agent of the carrier and the shipper other maximum amounts than those mentioned in sub-paragraph a) of this paragraph may be fixed, provided that no maximum amount so fixed shall be less than the appropriate maximum mentioned in that sub-paragraph.

Those amendments—if they are part of the Hague Rules applicable to this Bill of Lading—would effectively prohibit Cast Europe from limiting its liability by defining a "container" as a "package." That is because B/L ¶ 10 says that when the Bill of Lading and the applicable version of the Hague Rules conflict as to the definition of "package," the statutory definition prevails.

Cast Europe and Grand Trunk urge the Visby Amendments are not part of the "Hague Rules … as enacted in [France]." They cite *Sunds Defibrator, Inc. v. M/V Atlantic Star*, No. 81 Civ. 0583 (PNL) (S.D. N.Y. July 29, 1983) [Available on WEST-LAW, DCT database], where the court considered the meaning of the following "paramount clause" included in a bill of lading executed in Sweden (which had also adopted the Visby Amendments):

ACL shall be responsible for the goods … subject to the Hague Rules contained in the International Convention for the Unification of certain Rules relating to Bills of Lading dated 25th August, 1924, and any legislation making those rules compulsory applicable to this Bill of Lading, including the Carriage of Goods by Sea Act of the United States of America, approved 16th April, 1936 or the Canadian Water Carriage of Goods Act of 1936.

*Sunds* refused to interpret the quoted language as including the Visby Amendments, because it referred only to the 1924 Rules and "any legislation making those rules compulsory." *Sunds* noted the Visby Amendments have not been adopted by most "maritime nations" and are not part of the specific United States legislation referred to as an example of "legislation making those rules compulsory."

This Court, however, must deal with a contract provision dramatically different from that in *Sunds*. It would have been difficult for any lawyer drafting a contract—even if that lawyer put his or her back into it—to devise less felicitous language than B/L ¶ 3. That paragraph does not clearly say the Hague Rules, in their original version as adopted in the country of shipment, are the only ones potentially paramount in construing and applying the Bill of Lading (essentially the Cast Europe-Grand Trunk position). Nor does it clearly say the Hague Rules, in the version in force in the country of shipment at the time the Bill of Lading is signed, have such paramount status (basically Association's contention). Either of those provisions would have posed an easy task for a skilled

draftsman, but Cast Europe's anonymous scrivener was certainly not that.

There might be other clues to just what the opaque provisions of B/L ¶ 3 are intended to convey, but the litigants have not provided them to this Court. Hence it is compelled to do the job armed with only the contractual language itself and usual principles of contract construction.

In material part, Cast Europe and Grand Trunk provide telltale evidence against themselves by the nature of their own argument. B/L ¶ 3 itself, in its final clause, specifies "the terms of the said Convention"—that is, the *undiluted* 1924 Rules— "shall apply" if certain legislation is not in force either in the country of shipment or the country of destination. By definition, then, that earlier-referred-to legislation would have to be *different* from the undiluted 1924 Rules—from the unaltered version as adopted in Brussels in 1924.

To deal with that fact, Cast Europe and Grand Trunk acknowledge that the contractual references in B/L ¶ 3 to "as enacted," to "such enactment ... in force" and to "corresponding legislation" must mean something other than the literal 1924 Rules. They would paint themselves out of the corner created by such acknowledgement by arguing those quoted terms refer to the variants on those Rules first adopted in the country in question, irrespective of when that first adoption took place (it will be observed, for example, that such first adoption in France did not take place until more than a dozen years after the 1924 Brussels Convention).

But that necessary concession by Cast Europe and Grand Trunk really does them in. Once they confirm (as they must) that *some* variants on the 1924 Rules *must* be meant by the opening description of the Hague Rules in B/L ¶ 3, they have established that the 1924 date is a mere referent rather than a literal incorporation by reference—a descriptive rather than a restrictive term. And having done so, they can offer no persuasive evidence why "as enacted" must be read "as *first* enacted" even though B/L ¶ 3 does not say so in those simple and readily available words.

After all, the Visby Amendments themselves are specifically intended, by the countries adopting them, to be *part* of the Hague Rules. Visby Amendment Art. 6 (quoted at 6 Benedict 1–28) reads:

As between the Parties to [the Visby Amendments] the [Hague Rules] and the [Visby Amendments] shall be read and interpreted together as one single instrument.

In France, then, the Hague Rules *are* the Amended Rules: the 1924 Rules as modified by the Visby Amendments.

Just how cramped and arbitrary the Cast Europe-Grand Trunk reading is may be illustrated by hypothesizing a country that first adopted the Hague Rules after 1968— and did so with the Visby Amendments in place of the corresponding provisions of the original 1924 Rules (nor is that a fanciful hypothesis—a number of countries (compare 6 Benedict 1–11 with *id.* at 1–31) did exactly that). Just how would Cast Europe and Grand Trunk say B/L ¶ 3 applies to that "country of shipment"—as *not* having adopted the Hague Rules at all, or as having adopted them with the Visby Amendments, or as having adopted the 1924 Rules except where the Visby Amendments would change them (leaving a partial vacuum), or what? It is patently absurd for Cast Europe and Grand Trunk to contend (as they essentially do) that the Hague Rules are no longer "in force" in France because it has since altered some portions of the 1924 Rules with the Visby Amendments.

So there is clearly no dispute among the parties that the mere reference to "1924" in B/L ¶ 3 does not itself constitute a limited citation to the literal language of what the Convention settled on in Brussels in that year. Instead the controversy boils down to whether the B/L ¶ 3 words "as enacted" mean "as *first* enacted" or "as *now* enacted" in the "country of shipment." At best in terms of Association's position in this case, the latter reading is strongly supported by B/L ¶ 3's later use of the words "in force"; at worst, the contract provision must be viewed as ambiguous.

■ With those alternatives · posed to this Court, the pro-Association answer is also compelled by the general rules for construing such documents. Bills of lading (as *Sunds* recognizes) are generally considered contracts of adhesion and are therefore construed against their preparers. *Vistar, S.A. v. M/V Sea Land Express,* 792 F.2d 469, 471 (5th Cir.1986). Furthermore, Cast Europe's reading of the Paramount Clause here must be considered as an attempt to limit its liability. Such attempts by common carriers are also strictly construed. See *Cole v. Canadian Pacific, Ltd.,* 22 N.B.2d 328, 338 (1978).

Cast Europe prepared the Bill of Lading. It would have been the easiest thing in the world for it to have limited paramountcy to the version of the 1924 Rules "as *first* enacted," or even specifically to have excluded the Visby Amendments from consideration if it wanted to. Those amendments have existed since 1968 and have been in force in France (a country where Cast Europe does business and from which it ships cargo) since 1977.

Even apart from those compelling factors (factors that include the legal principles that serve as the customary aids to construction), other language in the Bill of Lading itself may fairly be read as anticipating that post–1924–Rules provisions such as the Visby Amendments could apply. B/L ¶ 10 provides that a "container" is a "package," but that is qualified by the phrase "except as provided by such legislation where it applies." Because the 1924 Rules do not themselves include any language at all as to the meaning of "package," that language in B/L ¶ 10 would be meaningless unless later changes by the country of shipment (such as the Visby Amendments to those Rules) would apply to the Bill of Lading.

■ Grand Trunk's attempt to limit its liability to $500 Canadian for the single container shipped by Kuehne & Nagel is plainly invalid under the Hague Rules as they are "in force" in France—the Amended Rules. Those Rules do permit Cast Europe to limit its liability during the carriage of goods by sea to a set amount per "package." But the French enactment of those Rules prevents Cast Europe from defining a container holding multiple packages as a single "package" for purposes of limiting its liability. Kuehne & Nagel shipped 41 packages of furniture, albeit in a single container. Cast Europe may therefore limit its liability only to a set amount for each of those packages, not for the Container as such.[8]

### B/L ¶ 9

Association—not knowing, of course, how this Court would view the issue just decided—has advanced a fallback argument. It contends that even if the French version of the Hague Rules were construed to allow Cast Europe to limit its liability during the *maritime* portion of the shipment, other legislation would prevent it from doing so during the *inland* portion.[9] Although Association tendered that as an alternative position, in an odd way its success on its other contention does not moot this one. That is so because that second argument, when turned on its head, could work in Cast Europe's favor: Even though legislation (the Hague Rules) prevents Cast Europe from limiting its liability to a set amount per "container" while at sea, that

---

8. This Court need not now decide what that minimum amount per package would be—whether the applicable minimum per package is $500 Canadian or 10,000 gold francs or 30 gold francs per kilo of gross weight of the damaged goods (the latter two limitations are those reflected in the Visby Amendments). In any event it is clear that Cast Europe could not legally limit its liability for all 41 packages to less than the $12,275 sought by Association in this action.

9. Association also made a third argument: that although B/L ¶ 10 might effectively limit its claim against Cast Europe, that provision could not so limit any claim against Grand Trunk. However, Grand Trunk's liability in this action is wholly derivative: It is entirely dependent upon the success of Association's claim against Cast Europe (as stated earlier, Association has made no direct claim against Grand Trunk). Hence if Cast Europe's potential liability to Association were no more than $500 Canadian, Grand Trunk's derivative liability to Cast Europe would have the same limitation.

may not be true for the inland leg or legs of the shipment.

B/L ¶ 9 makes Cast Europe responsible for goods shipped from the "place of receipt" (Serrieres de Briord, France) to the "place of delivery" (Chicago, Illinois), despite Cast Europe's having subcontracted with third parties for the inland part of the transportation:

>    9.  **Carrier's responsibility:**
>
>    Except as otherwise provided herein, the Carrier's responsibility for goods shall commence at the time when such goods are received by the Carrier at the port of loading and shall terminate when such goods are delivered by or on behalf of the Carrier at the intended port of discharge. Notwithstanding the above, where the space(s) entitled "Place of Receipt" and/or "Place of Delivery" on the face hereof are completed, the contract contained in or evidenced by this Bill of Lading is for through transportation from and/or to the place(s) so named and the Carrier's responsibility shall then commence at the time when the goods are received at the place of receipt so named (if any) and/or terminate at the place of delivery so named (if any). During the periods before loading of the goods on board of the ocean vessel and after discharge of the goods therefrom including any through transportation as hereinabove provided, the Carrier hereby accepts the same liability in respect of the goods as would have existed if every sub-contracting party had made a separate and direct contract with the Merchant on the standard terms and conditions of business of the sub-contracting party in respect of that part of the through-transit, cargo handling or warehousing undertaken by the sub-contracting party. If it cannot be established in whose custody the goods were when damage or loss occurred the damage or loss shall be deemed to have occurred

during the sea voyage and the appropriate Hague Rules legislation shall apply. That calls for a look at "the standard terms and conditions of business of the sub-contracting party" in the inland portion of the shipment.

In this instance there were two sub-contracting parties, both railroads, that handled the packages after they were unloaded in Canada. One of them, Grand Trunk, is the third-party defendant in this case, and it has admitted for purposes of the current motion that the damage to the shipment occurred while in Grand Trunk's possession. Although that limited admission obviously bears on Cast Europe's claim for indemnification from Grand Trunk, brief reflection confirms it really cannot limit Association's claim against Cast Europe. As between the latter two parties, Cast Europe has made no such admission. As a result, for purposes of determining Cast Europe's liability to Association, the unresolved factual issue as to where the damage occurred requires further analysis:

>    1.  If the damage was sustained while the goods were at sea, the Hague Rules apply and prevent Cast Europe from using B/L ¶ 10 and its container-equals-package provision.
>
>    2.  If however the damage clearly occurred while the goods were inland, a different result might follow.[10]

In light of those alternatives, the rest of this opinion proceeds on the assumption that any damage to the furniture occurred after it was unloaded in Montreal.[11]

■ By their express terms the Hague Rules apply only to the carriage of goods by sea, but the parties to a bill of lading can by express agreement extend them to inland shipments. Tetley, *Marine Cargo Claims* 9 (2d ed.). B/L ¶ 3 may have in fact done just that by making the Hague Rules applicable to "this contract," because the contract is one for the shipment of goods to an inland destination.[12] On that

---

**10.** Under B/L ¶ 9 the "appropriate Hague Rules legislation" would also apply even "if it cannot be established in whose custody the goods were when damage or loss occurred."

**11.** None of the parties even mentions the possibility the damage occurred before the Container

was loaded in Antwerp. This opinion does not address the implications of that possible scenario.

**12.** As Association points out, although the Bill of Lading does call for the Container to be unloaded from the Cast Polarbear in Montreal,

premise the earlier analysis in this opinion would apply, and France's Amended Rules would prevent Cast Europe from limiting its liability under B/L ¶ 10 during the entire shipment.

 What of a different reading of B/L ¶ 3, under which it would not make the Hague Rules applicable to the overland part of the shipment? Even so, the B/L ¶ 10 limitation of liability would be ineffective under "the standard terms and conditions of business of [the railroads]" with which Cast Europe subcontracted for shipment of the goods from Montreal to Chicago. That is so because under both Canadian and United States law, a railroad could not use B/L ¶ 10 to limit its liability to a set amount per container:

1. By Canadian statute, all attempts by a railroad to limit its liability for the carriage of goods within that country must be approved by the Canadian Transport Commission (*Cole*, 22 N.B.2d at 39; *N.Y. Central Railroad Co. v. Elliot*, 2 D.L.R. 973, 975–76 (N.S.1928)). There is no evidence B/L ¶ 10 has been so approved.

2. As for the rail transport within the United States, B/L ¶ 10 would constitute an automatic limitation on liability unless the shipper affirmatively chose to declare an ad valorem value for the cargo and pay a higher shipping rate. That would render B/L ¶ 10 ineffective here as well (*CO–OPerative Shippers, Inc. v. Atchison, Topeka and Santa Fe Railway Co.*, 613 F.Supp. 788, 793–94 (N.D.Ill.1985)).

Thus each route leads to the same destination: the ineffectiveness of the one-container-one-package limitation.

### Conclusion

Unlike the Old North Church signals for Paul Revere, this is not a case of "one if by land and two if by sea." Regardless of where the damage to the insured goods occurred, Cast Europe cannot validly limit

its liability to $500 Canadian for the entire shipment of 41 packages of furniture. Any such limitation in the Bill of Lading is invalid under both (1) the Hague Rules in force in France and (2) any legislation— whether in Canada or the United States— allowing railroads to limit their liability.

In submitting the issues to this Court under Rule 16, all parties expressed the view that resolution of the current motion would prove dispositive of the entire case. This action is accordingly set for a status report June 25, 1987 at 9:00 a.m.

---

it does not say how it would be transported from there to Chicago. Because Chicago is a port accessible from Montreal via the St. Lawrence Seaway, it was at least possible the rest of the carriage would also be by ship. That pros-

pect makes it at least questionable, on the record before this Court, to treat the parties as necessarily having agreed to apply the Hague Rules to such part of the shipment as actually turned out to be overland.